**1040**

PIEDMONT MINERALS COMPANY,
Inc., Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. C–35–G–67.

United States District Court
M. D. North Carolina,
Greensboro Division.

Jan. 15, 1969.

Norman Block, of Block, Meyland & Lloyd, Greensboro, N. C., for plaintiff.

William W. Guild, Dept. of Justice, Washington, D. C., and William H. Murdock, U. S. Atty., Greensboro, N. C., for defendant.

## MEMORANDUM OPINION

GORDON, District Judge.

This case was instituted by the plaintiff, Piedmont Minerals Company, Inc., (Piedmont) to recover Federal corporate income taxes and accrued interest, assessed and collected from the plaintiff by the District Director of Internal Revenue, United States Treasury Department, Greensboro, North Carolina, for asserted deficiencies for the taxable years ending June 30, 1961, 1962, and 1963, plus interest as provided by law from the dates of payment.

Plaintiff contends that the deficiencies were erroneously assessed and collected, since it was entitled to the deductions claimed by it as "interest paid," during each of the taxable years involved, because the amount so paid by the corporation and so claimed as deductions on its Federal income tax returns were payments, in law and in fact, of interest on bona fide corporate indebtedness. Defendant contends that the advances in the amount of $178,000.00 made by Boren and Harvey to the plaintiff constitute contributions to the capital of the plaintiff and do not constitute

indebtedness of the plaintiff. Therefore, the defendant says the payments of interest during the years 1961, 1962, and 1963 to Boren and Harvey on these advances are dividends and, as such, are not deductible as expenses under § 163 of the Internal Revenue Code of 1954.

On this issue properly joined, for reasons which are more fully set out herein, the Court concludes that the deductions should have been allowed as deductions for interest paid on bona fide corporate indebtedness under § 163(a) of the Internal Revenue Code of 1954 and allows the relief herein requested.

The case was duly brought on for trial before the Court without a jury. There is no substantial controversy on the facts. Having considered the evidence, proposed findings of fact presented by counsel, briefs, oral arguments, and the entire official file, the Court makes the following findings of fact:

1. In 1934 John A. Boren and E. M. Harvey organized a small manufacturing plant to produce refractory products. This business was incorporated in 1938 and is now known as North State Pyrophyllite Company, Inc. (North State).

2. Boren and Harvey used ore from a deposit that they owned at Snow Camp, North Carolina, to produce refractory products. The ore in the Snow Camp deposit was so rich in pyrophyllite that the ore could be used without putting it through a mineral processing plant.

3. North State was manufacturing several types of refractory products produced from a formula discovered by Boren and Harvey through prior trial and error experiments by mixing the crude ore from the Snow Camp deposit which contained almost pure pyrophyllite, with clay.

4. In the early 1950's the pyrophyllite ore in the Snow Camp deposit was diminishing in quantity. Dan E. Stephens, an employee of North State, had learned to visually recognize pyrophyllite from handling ore from the Snow Camp deposit. Management of North State loaned Stephens to Boren and Harvey

Mining Enterprises to prospect for pyrophyllite. He discovered a deposit near Hillsborough, North Carolina, which he thought contained pyrophyllite. Boren and Harvey Mining Enterprises acquired this deposit.

5. Because the ore in the Snow Camp deposit was beginning to run low, management of North State attempted to use ore from the Hillsborough deposit in the same manner it had used ore in the Snow Camp deposit, but the ore from the Hillsborough deposit would not produce satisfactory refractory products.

6. In the early 1950's North State had neither the laboratory nor the trained personnel (1) to determine the type and nature of minerals, other than to recognize pyrophyllite by sight, or (2) to calculate the percentage of pyrophyllite in the Hillsborough deposit, or (3) to design a method to process the ore of the Hillsborough deposit to make it commercially usable in the manufacturing of refractory products.

7. Boren and Harvey sent samples of the ore from the Hillsborough deposit to the North Carolina State College Mineral Research Laboratory in Asheville, North Carolina, for mineral analysis. The research work was conducted by, or under the direction and supervision of, Mason K. Banks, a graduate geologist specializing in minerals, and who, at that time, was Chief Mineral Engineer of North Carolina State College Minerals Research Laboratory. Banks advised North State that his research in the laboratory revealed the ore contained an average of 37 per cent andalusite, 10 per cent pyrophyllite, and 53 per cent waste material. Banks expressed the belief that the Hillsborough deposit contained considerable potential for the production of andalusite and pyrophyllite concentrates. A pilot processing plant was designed and erected by Banks at the North Carolina State College Research Laboratory, and was operated under his supervision. This pilot plant produced from samples of ore from the Hillsborough deposit pyrophyllite concentrates which North State used and which pro-

duced satisfactory refractory products. Management of North State became convinced that the ore from the Hillsborough deposit, if properly processed, could be commercially used in the manufacture of its refractory products.

8. Because North State did not have in its employment a trained geologist or mineralogist competent in designing and operating a plant to process the ore from the Hillsborough deposit, in April, 1957, it employed Mason K. Banks, formerly Chief Engineer of the North Carolina State College Minerals Laboratory, to make a geological study of the Hillsborough deposit and to design a method of processing ore so that it would produce pyrophyllite concentrates which (1) would be commercially acceptable for use in the manufacture of refractory products, and (2) to produce concentrates which would be acceptable to the whiteware trade.

9. After Banks had completed his initial research work at the Hillsborough deposit, which took approximately one year, he reported to the management of North State that he felt he could design a processing plant which would dress the ore from the Hillsborough deposit in such a manner as to produce concentrates from such ore commercially salable to the refractory industry and concentrates from designated portions of the ore salable to the whiteware trade. He advised Harvey, and then Boren and Harvey, that in his opinion a new company should be formed to process the ore from the Hillsborough deposit.

10. Banks informed Boren and Harvey, in a series of conferences, that he thought he should have a 24 per cent proprietary interest in the new company, which interest would not change percentage-wise as long as he retained ownership of his stock. Banks further advised Boren and Harvey that unless a new mineral processing company was organized in a manner to give him such a proprietary interest and on the conditions stated by him, he would have to seek employment elsewhere.

11. Stephens, after prior conferences with Banks, advised Harvey, and then Boren and Harvey, that he likewise thought a new mineral processing company should be formed and that he thought he should be given the same proprietary interest in the new company as Banks had requested, on the same terms and conditions as Banks, except Stephens did not make his continued employment with North State a condition precedent to obtaining such proprietary interest in the proposed company.

12. Following a series of conferences between Boren, Harvey, Banks, and Stephens, Boren and Harvey advised Banks and Stephens they would accept all terms and conditions of their proposal to form a new mineral processing company except that they proposed that Banks' and Stephens' proprietary interest should be 10 per cent each instead of 24 per cent. After considering this counter-proposal, Banks and Stephens accepted it.

13. Banks was the only individual in the employment of North State that had the background and training to design and develop a plant to process the ore from the Hillsborough deposit.

14. Shortly after Banks and Stephens had informed Boren and Harvey that they accepted the counter-proposal, the four men met and discussed matters connected with the formation of the new company. Boren pointed out that the amount of money which would be needed to operate the proposed ore processing company was not known and could not be anticipated at the time, but he knew it would be a substantial amount. Banks and Stephens stated that because of their limited income, their family obligations, and their indebtedness for recently acquired homes, they were not in a position to make a substantial investment in the new company by the payment of cash for their 10 per cent interest. Boren and Harvey knew the amount of Banks' and Stephens' annual compensation, their family conditions, and their financial position. Boren sug-

gested the new company be organized as a corporation, the initial amount of stock to be issued would be $1,000.00; Banks and Stephens would each buy $100.00 worth of stock and Boren and Harvey would each buy $400.00 worth of stock. Boren further pointed out that the new company could, after its formation, borrow money from time to time at the going rate of interest either from a commercial bank or from him and Harvey, who had funds to loan. Boren stated that if the new company went to a bank to borrow money, he and Harvey would be required by a lending bank to endorse the new company's notes, and he saw no reason why the new company could not borrow funds from him and Harvey, if the owners of the new company were willing to pay them 6 per cent interest, the same amount the new company would have to pay a bank. This plan of organization was acceptable to Banks and Stephens and they agreed to it.

15. The Articles of Incorporation of Piedmont Minerals Company, Inc., were issued by the Secretary of State of North Carolina on May 21, 1958. The organizational meeting was held in the office of N. D. McNairy, the attorney for North State. Boren, Harvey, Stephens, and Banks advised McNairy at this meeting that they, as stockholders, would purchase $1,000.00 worth of stock, 10 per cent to be purchased by Banks and Stephens, respectively, and 40 per cent by Boren and Harvey, respectively; that they estimated the cost of the plant to be constructed by Piedmont would be in excess of $100,000.00 and that Boren and Harvey proposed to loan Piedmont sufficient funds to start operations pursuant to the original agreement made between the four of them. McNairy advised them Piedmont could so be organized under the laws of North Carolina. The charter was then received, the By-Laws adopted and the officers elected. The stock was issued and paid for as follows: Boren, 40 shares, $400.00; Harvey, 40 shares, $400.00; Stephens, 10 shares, $100.00; and Banks, 10 shares, $100.00.

16. At the organization meeting, the Board of Directors authorized Piedmont to borrow $30,000.00 from Boren and Harvey, and from time to time Boren and Harvey made loans to Piedmont as follows, including the first advance of $30,000.00:

| Amounts Advanced by Boren | Amounts Advanced by Harvey | Date of Notes Evidencing Advancements |
|---|---|---|
| $15,000.00 | $15,000.00 | June 2, 1958 |
| $25,000.00 | $25,000.00 | July 3, 1959 |
| $25,000.00 | $25,000.00 | October 16, 1959 |
| $20,000.00 | $20,000.00 | December 15, 1959 |
| $ 4,000.00 | $ 4,000.00 | January 1, 1960 |

In return for each of the above advances, Piedmont executed and delivered to Boren and Harvey, respectively, its negotiable demand note in the face amount of each advance, bearing interest at the rate of 6 per cent per annum. The notes did not contain a subordination clause of any type nor did they define or restrict the source from which the principal and interest was to be paid.

17. The first two notes enumerated in Paragraph 16 above were secured by a chattel deed of trust which was not recorded because Boren filed it with his papers at home in Guilford County and forgot to record it in Orange County where the machinery was located. The documents were drafted by McNairy, attorney for Piedmont Minerals. The other negotiable demand notes of Piedmont set forth in Paragraph 16 were prepared

by management of Piedmont, using the notes prepared by the Company's attorney as a form.

18. When the advances set forth in Paragraph 16 were made by Boren and Harvey to Piedmont, Boren and Harvey intended such advances to be loans and expected them to be repaid by Piedmont with interest at the rate of 6 per cent per annum. The directors of Piedmont understood that each such advance when made was a loan by Boren and Harvey to Piedmont and understood that the negotiable notes of Piedmont given in exchange for each such advance constituted a valid corporate debt of Piedmont to be paid by Piedmont. On each annual financial statement of Piedmont Minerals Company, Inc., prepared for the corporation by A. O. Smith, Greensboro, North Carolina, an independent accountant, the amount of the notes was carried on the financial statement of Piedmont Minerals Company, Inc., as "notes payable." The financial statements were made available to Dun & Bradstreet and to suppliers, banks, and other creditors of Piedmont Minerals Company, Inc., when requested.

19. During the pre-incorporation meetings, between Banks and Stephens and between Banks, Stephens, Boren, and Harvey, and during their meeting with McNairy, Piedmont's attorney, the question of federal income tax consequences of capitalizing Piedmont in the manner suggested by Boren and agreed to by the others, was never discussed. Likewise, the Federal income tax consequences of Boren and Harvey lending money to Piedmont, or Piedmont's payment of interest on such loan or its repayment of such loans were not taken into consideration or discussed by the incorporators of Piedmont and their advisors, and was not a fact or reason for capitalizing Piedmont in the manner in which it was capitalized.

20. The primary purpose for the formation and organization of Piedmont Minerals Company, Inc., and capitalizing it in the manner in which it was capitalized was to retain, within the Boren and Harvey group of enterprises, the services of Mason K. Banks, a qualified and experienced geologist and mineral engineer, so that he, Banks, would be available to design, erect and operate a mineral processing plant capable of dressing the ore from the Hillsborough deposit to produce pyrophyllite concentrates which could be used by North State in the manufacture of its refractory products, and to produce other concentrates which, hopefully, could be sold commercially to the whiteware trade.

21. Interest was paid on these loans regularly as provided in the notes. From June 30, 1961, through June 30, 1964, the interest due on the notes had been currently paid to Boren and Harvey. Piedmont paid in full on January 1, 1964, the notes given by it to Boren and Harvey, respectively, in the principal sum of $4,000.00 each, representing loans made to it by Boren and Harvey in January, 1960.

22. Following the end of Piedmont's fiscal year, ended June 30, 1964, and as soon as A. O. Smith, Piedmont's independent accountant, would have returned the Company's books, Piedmont planned to make a substantial payment on the principal of its notes payable to Boren and Harvey. In the latter part of July or the 1st of August, 1964, Revenue Agent Sam B. Foushee began an audit of Piedmont's tax returns and prior to September 11, 1964, he advised Piedmont that the Internal Revenue Service might disallow the interest paid by Piedmont to Boren and Harvey on Piedmont's notes to them as a deduction from Piedmont's gross income for federal income tax purposes. On September 22, 1964, Piedmont employed Norman Block as its special tax counsel. On October 20, 1964, Block advised Boren that Piedmont should not make any further payments on the interest or principal of its notes to Boren and Harvey until he had conferred with Revenue Agent Foushee and had further investigated the basis on which the Commissioner proposed to assert a deficiency against Piedmont. Subsequently, Block advised

Piedmont to make the proposed payments of principal and interest on its notes payable to the order of Boren and Harvey in escrow.

23. Prior to the end of Piedmont's fiscal year, June 30, 1965, Block drafted an agreement between Piedmont and N. D. McNairy, who was therein designated as Escrow Agent. The agreement was executed on June 28, 1965. At the time the escrow agreement was executed, the unpaid principal balance on Piedmont's note to Boren and Harvey amounted to $170,000.00. Piedmont made the following payments to N. D. McNairy, Escrow Agent:

| Date of Payment | Amount of Payment to be Held by Escrow Agent as Interest on Corporate Notes to Order of Boren and Harvey | Amount of Payment to be Held by Escrow Agent on Principal of Notes |
| --- | --- | --- |
| June 28, 1965 | $16,197.99 | $ 85,000.00 |
| June 23, 1966 | $10,200.00 | $ 85,000.00 |
| Total | $26,397.99 | $170,000.00 |

to be held pursuant to the terms and conditions of the escrow agreement dated June 28, 1965, and subject to the outcome of this litigation.

24. The Commissioner of Internal Revenue, by letter dated April 19, 1965, asserted deficiencies and accrued interest totaling $10,365.77 against the plaintiff for its taxable years ending June 30, 1961, 1962, and 1963. The basis upon which the Commissioner asserted such deficiencies was that the loans made by Boren and Harvey to the plaintiff corporation constituted capital investment in the plaintiff corporation and were not bona fide loans and that, therefore, the interest deductions claimed by the plaintiff corporation on its federal corporate income tax returns for the years in question should be disallowed.

25. The deficiencies and accrued interest were paid to the District Director, Internal Revenue Service, Greensboro, North Carolina, on May 6, 1965.

## DISCUSSION

The issue before the Court is whether the amounts advanced by Boren and Harvey to Piedmont were loans or contributions to capital for tax purposes. If the advances are found to be loans, the interest deductions should have been allowed and the plaintiff is entitled to the refund requested. On the other hand, if the advancements are found to be contributions to capital, the payments made to Boren and Harvey as interest are, in fact, dividends and no deduction is allowed under Section 163(a) of the Internal Revenue Code of 1954.

From the cases cited by both parties, it is evident that a determination for tax purposes of whether an advance made by stockholders to a corporation creates debt or actually represents a contribution to capital depends upon the particular facts of each case. The facts of this case show that a loan transaction was intended, it being in the form of a loan, was treated as a loan, and in substance was a loan.

■ Although no one factor controls the determination of this question, the courts have usually recognized that advances or loans to a closely held corporation create a true debtor-creditor relationship for tax purposes where there is a demonstrable business purpose in making the loan and the transaction is not a sham to avoid federal corporate taxes. J. S. Biritz Construction Co. v. C. I. R., 8

Cir., 387 F.2d 451 (1967); Byerlite Corp. v. Williams, 6 Cir., 286 F.2d 285 (1960). There was such a business purpose in this case.

The plaintiff was formed, primarily, to retain for Boren and Harvey enterprises the valuable services of Mason K. Banks. North State, owned by Boren and Harvey, was faced with depletion of its main source of raw material, i.e., a rich deposit of pyrophyllite at Snow Camp, North Carolina. Boren and Harvey had acquired another source of pyrophyllite ore at Hillsborough, North Carolina, but this deposit was a much poorer grade of ore than the Snow Camp deposit. The ore from this deposit could not be used in its crude state as could the ore from the Snow Camp deposit. Banks was the only person in the employment of North State who had the technical knowledge to design a plant to refine the ore so that it could become a satisfactory raw material for North State. Banks demanded that a new mineral processing company be formed and that he have a proprietary interest in such company or he would seek employment elsewhere. However, neither Banks nor Stephens, a long time employee who also requested a proprietary interest in the new company, could supply their pro rata share of the sum of money which was necessary to expend in order to build and operate a plant to refine the Hillsborough ore.

Faced with the prospect of losing the only man with North State who could resolve the serious problem of refining the ore, Harvey agreed with Boren's suggestion to capitalize Piedmont with nominal capital investment in order to permit Banks and Stephens to obtain the 10 per cent proprietary interest each demanded. Boren and Harvey agreed to loan the new corporation whatever money it needed from time to time to become self sufficient. The evidence is convincing that the primary reason for capitalizing Piedmont with a small capital investment was to allow Banks to have the proprietary interest in the new company that he demanded as a condition to his remaining with Boren and Harvey enterprises. Therefore, there was a valid business purpose for capitalizing the new company in the manner it was capitalized. The transaction was not a sham to avoid federal corporate taxes.

Another crucial factor to consider in determining whether the amounts advanced created a bona fide debt for tax purposes is the intent of the parties involved. This intent is not to be derived solely from their testimony, but all the surrounding circumstances must be considered. Wood Preserving Corporation of Baltimore v. United States, 4 Cir., 347 F.2d 117 (1965).

In the case before the Court, all parties testified that they intended to create a debtor-creditor relationship as to the amounts advanced by Boren and Harvey. After considering all the surrounding circumstances, it is clear that their actions were consistent with their testimony. The advances were evidenced by valid debt instruments, i.e., demand notes meeting the requirements for negotiable instruments under the Negotiable Instruments Law and the Uniform Commercial Code. Interest on the notes was paid when due and part of the principal has been repaid with the balance being held by an escrow agent until this litigation is finally determined. Also, there was a demonstrable business purpose for capitalizing the company in this fashion, previouly discussed, that would indicate that the parties intended the advances to be debt, not investments in equity capital.

These notes were not subordinate to other indebtedness of the taxpayer. The negotiable demand notes of the taxpayer did not contain any provision subordinating the claims of Boren and Harvey to the claims of other general creditors of Piedmont, and Boren and Harvey made no such agreement with any general creditor before or after the notes were written, executed and delivered by Piedmont to them. The amount of the notes was carried on the financial statements of Piedmont as "notes payable"

and such statements were made available to Dun & Bradstreet and to suppliers, banks and other creditors of Piedmont when requested.

Upon cross-examination, Harvey testified that if Piedmont had financial problems he would see that a $50,000.00 bank note was paid before he was paid. Of course, Harvey could do this if he desired, but he was under no legal obligation to do so. Boren and Harvey possess rights equal to those of the other general creditors of the taxpayer, so the notes were not subordinate to other indebtedness of the taxpayer which further indicates that the advances were debt, not contribution to capital.

Boren and Harvey had a reasonable expectation of repayment at the time of the loans because the risk of business failure of Piedmont at that time was minimal. Prior to and at the time the advances were made, Mason K. Banks had proven that he had the skill, knowledge and ability to design and erect the processing plant to produce pyrophyllite concentrates from the Hillsborough deposit which concentrates could be used commercially to produce refractory products. A solvent buyer, North State was ready and willing to purchase the plaintiff's output.

The defendant contends that the advances were contributions to capital, not indebtedness, because the advances were made at the risk of the business of the taxpayer. As stated above, the business risk was minimal and the fact that Piedmont relied upon expected earnings to repay Boren and Harvey would not conclusively make the money advanced a contribution to capital. In Miller's Estate v. C. I. R., 9 Cir., 239 F.2d 729, 732 (1956), the court stated:

"Many borrowers rely upon expected earnings for payment of their debts. We cannot see any justification for inferring that a promissory note is unreal and not representative of the actual arrangement merely because the maker expects to pay out of future earnings."

This statement was quoted with approval in J. S. Biritz Construction Co. v. C. I. R., supra.

The defendant further contends that the advances were in proportion to stockholdings and this is evidence of capital contribution, not debt. It is true that advances pro-rata to stockholdings is some evidence of capital contribution, not debt, but the advances were not pro-rata to stockholdings in this case. The stockholders, along with their respective interest, were Boren, 40 per cent, Harvey, 40 per cent, Banks, 10 per cent, and Stephens, 10 per cent. Boren and Harvey owned 80 per cent of the stock and advanced 100 per cent of the money, while Banks and Stephens owned 20 per cent of the stock and advanced none of the money. Since the advances were not pro-rata, another factor arises pointing to debt rather than contribution to capital.

The defendant also asserts that the "thin" capitalization of the taxpayer in light of its known needs is strong evidence that the advances constitute capital, not debt. In this case, the defendant asserts that the debt-equity ratio before the commencement of operation was 37½ to 1 and increased to 222.5 to 1 within a year and a half. The taxpayer argues that its debt-equity ratio was never higher than 2 to 1. In light of the factors previously discussed, a determination of the true or exact debt-equity ratio is not necessary. Even if we assume that Piedmont was a "thin corporation," this factor, standing alone, is not sufficient to make the advancements a contribution to capital rather than a loan. Piedmont Corporation v. C. I. R., 4 Cir., 388 F.2d 886 (1968); Rowan v. United States, 5 Cir., 219 F.2d 51 (1955).

■ Summarizing, the money owed by Piedmont to Boren and Harvey was a valid business debt of Piedmont for tax purposes for the following reasons: (1) there was a demonstrable business purpose in making a loan and the transaction was not a sham to avoid federal

corporate tax; (2) the parties intended to create a debtor-creditor relationship and their actions were consistent with this intent; (3) the negotiable demand notes evidencing the indebtedness were not subordinate to other general creditors of Piedmont; (4) the risk of business failure by Piedmont at the time of the advances was minimal; and (5) the advances were not pro-rata to the stockholdings. With these factors strongly indicating that the advances were debt, not contributions to capital, the fact that Piedmont was thinly capitalized, according to the defendant's calculations as to debt-equity ratio, is not sufficient to make the advances contribution to capital rather than debt.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and of the parties in this action.

2. Piedmont Minerals Company, Inc., was created, organized and capitalized pursuant to the applicable provisions of the North Carolina Business Corporation Act.

3. The advances made by John A. Boren and E. M. Harvey to Piedmont Minerals, Company, Inc., from June 2, 1958, through January 1, 1960, totaling $178,000.00, $89,000.00 each, were bona fide loans to Piedmont for Federal income tax purposes.

4. The amounts accrued by Piedmont on its books during the fiscal years ending June 30, 1961–63, inclusive, and designated as interest paid on notes from Piedmont to Boren and Harvey constitute payments of interest by Piedmont on its valid indebtedness to Boren and Harvey, and such accrued payments are deductible from the gross income of Piedmont in the year each such accrual was made pursuant to Section 163(a) of the Internal Revenue Code of 1954.

5. The plaintiff is entitled to recover judgment against the United States in the sum of $10,365.77 with interest thereon from the date of payment in the manner provided by law.

Counsel for the plaintiff will forthwith prepare and present to the Court a judgment conforming with this Memorandum Opinion, first presenting same to counsel for the defendant for approval as to form.