T.C. Memo. 2017-157

UNITED STATES TAX COURT

WILLIAM C. OWENS AND SHARON PIGG OWENS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26533-14.                    Filed August 10, 2017.

<u>Gerald S. Haislet</u> and <u>Michael T. Beuselinck</u>, for petitioners.

<u>Patsy A. Clarke</u> and <u>Dean H. Wakayama</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  William Owens has spent his career lending money for a profit, whether through business entities or out of his personal funds.  One of his personal loans to a commercial laundry wound up mangled into a total loss. Owens claimed a bad-debt deduction, and the Commissioner objected.  His

[*2] primary argument is that Owens's private lending was not a trade or business. But he has a load of other contentions which we'll have to iron out here as well.

FINDINGS OF FACT

Owens lends money for a living now, but after he graduated from Westmount College in 1973 with a B.A. in literature he had hoped to pursue a career in property development. After college he headed in that direction and took a job with a company that harvested trees and sold timber. He spent about six months there before he took a job with a land-development company that sold campsites in the Sierra.

But his father was in the moneylending business and it wasn't long before he answered his family's call to assume his own place in the firm.

A.    Owens's Lending Career

The call came because Owens's father had lent money to a cemetery that fell behind on its payments. He dispatched Owens to assess the situation, and it turned out that the borrower had stolen the cemetery's trust fund. It was routine for Owens's father to take over the day-to-day operations of a failed debtor to make the best of a bad deal. (The industry term for this is a "workout".) Owens was told to do just that. So for the next 2-1/2 years Owens ran the cemetery and tried to fix its problems. The Owenses eventually took a loss on the loan, but less of

**[*3]** one than they might have.  Owens soon took on a second workout and then "reluctantly" went to work for his father.  Whatever reluctance he might have felt in his youth couldn't mask his skill in the business.  It didn't work out horribly in the end:  He, and what is now *his* company, have made billions from loans over the last 35 years.  Here are the entities he uses.

      1.     <u>Owens Financial Group</u>

When Owens's father ran the moneylending business it was called Owens Mortgage Co., but under Owens's reign it became Owens Financial Group, Inc. (OFG).  OFG is a mortgage-broker company that arranges commercial loans.  Owens has been the president of OFG for more than 20 years and owns a majority interest in it.  OFG sits in a niche corner of that market--it offers short-term bridge financing when long-term funding is unavailable or too expensive.  OFG lends mostly to investors who want to buy (or sometimes sell) income-producing property and who need quick financing to close a deal.  After they close, it's possible for them to spend several months looking for a better long-term deal from a more traditional lender.  Loan terms at OFG are typically only around 18 months and earn an interest rate of between 7 and 11 percent.

Much of OFG's business originates from referrals--attorneys or accountants who have a client that needs to borrow money fast--but OFG also gets its fair share

[*4] of cold calls. The firm has a reputation for both "performance" and speed. They can give borrowers a simple yes-or-no answer on their loan application within just a couple days. And if the answer is yes, OFG moves right ahead and closes the deal. Owens's personal reputation is impressive too--both colleagues and competitors testified credibly that he is regarded as one of the best in the business. One employee even compared Owens's likeness to that of a god--Plutus, perhaps.

OFG typically gets about ten inquiries for every one it considers, and of course it does not approve every application it considers. The number of inquiries, applications, and loans depends on the broader economy. In the early 2000s, when the real-estate market was strong, the lending business was strong too. But after the crash in 2008, OFG was "practically out of business." It had several projects that were under water and it didn't have the capital to make new loans. The firm survived and began to thrive again after 2013, and Owens estimates that since then, it's made about 40 loans a year. This kind of bridge financing has always been a risky proposition, and Owens estimates that since he started working for OFG, the firm has made more than $2.5 billion in loans and had to foreclose on about $225 million of them.

**[*5]**  2.  <u>The Investment Fund</u>

During the years at issue, loans brokered by OFG were funded by the Owens Mortgage Investment Fund (Investment Fund).  The Investment Fund is a publicly registered limited partnership that OFG manages as its general partner.  The Investment Fund's portfolio includes both loans and real property nationwide.

3.  <u>Owens's Personal Lending</u>

In addition to his responsibilities at OFG and the Investment Fund, Owens also makes loans from his personal assets, and he has done so since at least 1986.  He explained during trial that the return on a personal loan was higher than any return that he'd see at a bank and that because his lack of experience made him uncomfortable investing in the stock market, he instead invested his assets by way of loans.  Owens credibly explained that these personal loans typically were to borrowers too risky for OFG, and his willingness to make them depended less on the value of any assets they might be backed by than it did on his belief in the borrower and his business model.  He testified that "they're very talented people in the world doing things, and they have stories tied to real estate.  They're going to transform a property or develop something or do something with a property [and] there's a captivating story that goes with it."

**[\*6]** Funds for Owens's personal lending came from his trust,[1] his pension plan account, and sometimes from a family limited partnership (FLP) he managed with his two sisters. He's made loans on his mother's behalf with money his father left in a trust for her. And he's also made loans on behalf of other family members, including his wife and aunt. He is, however, limited to making about $5 million in loans from his personal assets in a given year. He estimates that since 1979, he's made over 200 such loans--the amount per year increasing as he accumulated more savings over the years. During trial Owens provided documentation showing at least 89 loans made from 1999 through 2013 by Owens personally, Owens Trust, or the FLP.

Owens does not, and did not during the years at issue, keep a separate office for business related to his personal lending ventures. He instead conducted his personal business out of OFG. OFG staff handled all correspondence, documentation, and legal issues arising from Owens's personal lending. OFG staff also managed loan servicing throughout the duration of a loan. There was a

---

[1] Owens additionally has a personal trust (Owens Trust) that he created in 1993. He credibly testified that the money in the trust was his alone that he'd accrued over the years. Owens Trust is a revocable living trust and Owens is its only trustee. The Code defines such trusts as grantor trusts and treats their assets as owned by their settlor. See secs. 671-677. (All section references are to the Internal Revenue Code in effect for the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.)

[*7] file for each loan that included the underwriting documentation, legal documentation, and any security agreements. At the end of the day, the only difference between Owens's loans and OFG's loans is that the money goes into a different "bucket". Owens believes that because he's been the president of OFG since 1996, there would have been "no point" in having a separate office. He views OFG employees as *his* employees.

B.    Lohrey

In 2002 Owens began a series of loan transactions with a businessman named David Lohrey. Lohrey was in the laundry business. He'd started a laundry company in 1971 with his two older brothers called West Coast Linen, and together they grew it to become the largest commercial laundry in the San Francisco Bay Area. They serviced all the major hotel chains--Hyatt, Marriott, and even Hilton. They also serviced hospitals throughout northern California. But in the early '80s, Lohrey's brothers wanted to retire and he bought their shares of the company.

By that point Lohrey's largest corporate customer was Marriott--his company serviced several of its hotels in the Bay Area. They had a longstanding relationship, and it wasn't long before Marriott approached Lohrey with a deal: Marriott would buy a 50% stake in Lohrey's laundry and start a company called

[*8] Marriott Services that would bundle laundry with other services such as housekeeping and janitorial work. The business grew and became successful. Marriott bought Lohrey's stake, though he kept a finger if not a hand in the old business by continuing to own a commercial site in Gilroy (the Garlic Capital of the World and a thriving town south of the Bay Area) through Lohrey Investments, LLC. He leased this site to Marriott as a giant commercial laundry and he also worked as a consultant for the chain until about 2002. That was the year Marriott sold Marriott Services to a French company named Sodexo. Sodexo then downsized and decided to close the Gilroy laundry. Before it did so, however, Sodexo offered Lohrey an option to buy back the business. Lohrey exercised that option and in 2003 opened Lohrey Enterprises, d/b/a West Coast Linen.

He at first thought he would resell the operation or at least find someone else to lease it to.[2] While Lohrey was looking for a tenant, he was still stuck making payments on the property--$90,000/month. He paid out of pocket for a few months but eventually started to fall behind. And then Bank of America foreclosed on the property. Without comment on the practicality of the plan, but

---

[2] The Gilroy property had an unusual asset--a permit to use large quantities of water. These valuable water rights--grandfathered since the '70s--were rare for the area. They ran with the property but were fully transferrable.

[*9] upon advice from Lohrey's attorney, Lohrey Investments filed for chapter 11 bankruptcy as a delaying tactic. During the bankruptcy Lohrey's attorney was able to negotiate a buyout at a lower price--Lohrey would just have to find the money to pay off the new loan. With leave of the bankruptcy court Lohrey Investments was also able to purchase the equipment that Sodexo had left behind,[3] but much of the equipment had been taken out or gone missing after laundering had ceased. It was clear Lohrey needed more money to make the laundry company a success. Lohrey had previously been a frequent borrower at Bank of America, but since the expiration of the deal with Marriott, funding seemed too risky for the Bank, and it referred him to OFG.

1. Owens's Loans to Lohrey Investments

Owens reviewed the Gilroy property as well as Lohrey Investments' newly purchased laundry equipment and determined that they were worth $20 million. He also determined that OFG would be able to lend Lohrey Investments $7.5 million. Because that wouldn't be enough to pay off the current loan with Bank of America, Owens agreed to personally advance Lohrey Investments additional funds to "bridge the gap." Owens had appraisals of Lohrey Investments'

---

[3] The parties stipulated that a chapter 11 bankruptcy plan was approved by the Court in December 2003, and the bankruptcy closed in June 2004. See Order, In re Lohrey Invs., case No. 02-12951 (Bankr. N.D. Cal. 2003).

[*10] equipment drawn up and gathered Bank of America's appraisals of the Gilroy property before he issued the advances.

Everything checked out, and in July 2003 OFG made a $7.5 million loan to Lohrey Investments secured by a first deed of trust on the Gilroy property. A month later Owens made a personal loan to Lohrey Investments for $2.75 million. The loan was funded by Owens Trust and the FLP and had a 15% interest rate, required monthly payments, and had a maturity date of September 2005. This loan was secured by a second deed of trust on the Gilroy property, and unlike OFG's loan to Lohrey Investments, it was a "participating" loan. It gave Owens the right to participate in income over a certain threshold--something Owens explained is fairly typical when a lender takes a junior position in a transaction. "[T]here's more risk and you want a greater reward." Owens credibly testified that he forecasted Lohrey Investments would be in "growth mode" for at least the next two years. West Coast Linen did begin to grow rapidly and won more contracts from the San Francisco hotel industry. Lohrey Investments soon needed more equipment, and Owens was happy to keep the funds flowing. Everything went as planned with the first several loans, and Lohrey Investments kept up with its monthly payments, but that changed when it fell behind. Owens's business relationship with Lohrey Investments was about to get a lot more personal.

**[*11]** 2.     The Operating Agreement

Lohrey hit a point with West Coast Linen where he needed cashflow to expand the business, to increase profit margins, and ultimately to pay off his creditors.  Owens understood this, so when Lohrey Investments fell behind on its payments, he remained patient.  Owens was willing to wait for payments on his personal loans, especially because it meant Lohrey Investments would at least be making payments on the OFG loan.  The economy was stable, and Owens didn't think he had cause for concern.  Believing Lohrey was the best solution to his own problem, Owens deferred to his judgment for some time until he decided to exercise his option to acquire ownership in the company.

In December 2005, on the advice of an attorney, Owens entered into an operating agreement with Lohrey himself.  The operating agreement--which was admitted into evidence--made Owens Trust a member of Lohrey Investments with a 30% share of profit, 99% share of loss, and 30% of capital.  We find based on this agreement that it was a workout--Owens did not contribute any fresh money.  Owens was named the tax matters partner[4] of Lohrey Investments when the

---

[4] TEFRA partnerships are subject to special rules, see secs. 6221-6234, and each one is required to designate a tax matters partner to handle the partnership's administrative issues with the IRS and any resulting litigation.  Though it's not in the record, Lohrey Investments' appointment of a tax matters partner suggests that

(continued...)

[*12] agreement went into effect. Despite what the operating agreement said, however, Owens's K-1s for the 2006 and 2007 tax years reported him as having a 99% share of profit, 99% share of loss, and 99% capital of Lohrey Investments.

The K-1s reported net rental-real-estate losses of almost $4 million for 2006 and $2.8 million for 2007. Owens deducted each of these losses against the debt basis of the $16 million in loans he'd made to Lohrey Investments. See infra p. 15. Here things get confusing. The Commissioner argues that there was a conversion of debt to equity, but we find this not to be the case. There is no such provision in the operating agreement, which specifically provides that loans were *not* to be treated as capital contributions. Owens did testify that Lohrey's accountant suggested converting some debt to equity, but there's little or no evidence that he did so.

3.    Vestin

Owens's and Lohrey's new arrangement, however, didn't sate Lohrey's hunger for additional capital, and later in 2005 Lohrey approached Owens for a $20 million loan to pay off old debt and expand the laundry again. But Owens *and* OFG were tapped out. That's when Owens recommended that Lohrey talk to

---

[4](...continued)
it was indeed a TEFRA partnership. The complicated consequences of Lohrey Investments' being a TEFRA partnership, however, do not matter here.

[*13] Vestin Mortgage, Inc. Lending funds to Lohrey Investments at this point though was risky business, and the only way Vestin would do it was if Owens subordinated his own loans to Vestin. Owens agreed, but he didn't do so lightly.

Owens still believed in Lohrey's ability to run the laundry and thought that with Vestin's capital Lohrey would be able to get the business somewhere. He credibly explained that he had concerns. Owens felt his investment might be in "a dire situation" but even so, there was a glimmer of hope: Lohrey had begun negotiating a deal with Kaiser Industries to take over the laundry for 16 of their hospitals. Commercial laundering on this scale has low marginal costs and Owens took a calculated risk to subordinate his loans to Vestin so that Lohrey might succeed, and in turn, Owens would see a higher return. We specifically find that even though this business strategy failed in the end, it was nonetheless reasonable at the start.

In June 2006 Vestin lent $16 million to Lohrey Investments secured by the Gilroy property and the equipment within it. Lohrey Investments used part of the Vestin loan to fully repay OFG, but not Owens's personal loan. In anticipation of a deal with Kaiser, Lohrey Investments also used Vestin's money to buy more

[*14] equipment to handle more laundry.[5] The business started to grow. West

Coast Linen then won other contracts and bought even more equipment. Cashflow

grew, but not as quickly as Lohrey had projected.

    4.    West Coast Linen Folds

Lohrey did win the Kaiser contract. But in hindsight Owens believed that

Lohrey had underbid the contract and that it was costing West Coast Linen more

to process the laundry than the contract was bringing in. The end was near.

Owens believed Lohrey ignored professional advice to cut off the hotel business

and get things under control when the problem came to light. Lohrey Investments

became delinquent on the Vestin loan. In August 2008 Vestin recorded a notice of

default to protect its security interest in the Gilroy property. Lohrey was still not

convinced that the contract price was the problem; he focused instead on Kaiser's

taking 60-90 days to pay its invoices and tried to work out a deal for immediate

debit that he thought would increase his cashflow. It didn't work. Even though

Lohrey Investments was processing about 150-175 *tons* of laundry a day, there's

no making up on volume when one loses money on every sale, and the business

couldn't make the $500,000 bi-weekly payroll for its 700 employees.

---

    [5] There was a great deal of optimism regarding the Kaiser contract so
Owens also made more loans to Lohrey Investments. See infra p. 15.

[*15]  It was October 2008, the start of the Great Recession, and Lohrey was out of options.  Owens had made many personal loans to Lohrey Investments, all memorialized in promissory notes.  We summarize them here:

| Loan No. | Date | Amount |
|---|---|---|
| 50898 | 08/22/2003 | $1,100,000.00 |
| 50926 | 12/02/2003 | 1,647,984.56 |
| 50950 | 03/26/2004 | 1,850,000.00 |
| 50950B | 07/29/2004 | 2,200,000.00 |
| 50950D | 11/23/2004 | 1,100,000.00 |
| 50995 | 12/09/2004 | 2,100,000.00 |
| 51018 | 03/30/2005 | 1,200,000.00 |
| 51133 | 04/18/2007 | 1,000,000.00 |
| 51147 | 08/24/2007 | 1,000,000.00 |
| 51151 | 11/12/2007 | 1,357,000.00 |
| 51156 | 12/03/2007 | 800,000.00 |
| 51165 | 07/18/2008 | 600,000.00 |
| 51170 | 03/17/2008 | 345,645.00 |
| Total | | 16,300,629.56 |

5.    Three Bankruptcies

a.    West Coast Linen

West Coast Linen filed for chapter 11 bankruptcy that month.  It was meant only as a delay tactic until Lohrey could get an automatic-debit system in place,

**[*16]** but it ended in disaster. After meeting with the acting chapter 11 trustee,[6] Lohrey woke in the early morning hours to find that West Coast Linen had new locks.

Lohrey solemnly described his memory of that morning. The trustee had padlocked the gate to West Coast Linen around midnight. By about 4 or 5 a.m. that morning, Lohrey's phone started ringing off the hook--hotels, hospitals, employees--no one could get in the building, and no one knew what was going on. This was devastating: Hospitals and hotels typically have only three to four sets of linens--one on the bed, one on the shelves, and at least one being washed. And both industries rely on their laundry services. Lohrey said that as a result of the padlock, "you now have thousands and thousands of sick people in hospitals literally laying on mattresses with no sheets, no gowns, no operating * * * literally overnight you had 25,000 people with no towels, no sheets, and no surgeries."

This was the end of West Coast Linen. In late November 2008 its chapter 11 bankruptcy was converted to a chapter 7 bankruptcy, and when it was, the company--though it couldn't operate--still listed $4,835,000 in assets and only

---

[6] A trustee is a neutral third party brought in to make decisions. The court appoints a trustee in a bankruptcy case either for cause (including fraud, dishonesty, or gross mismanagement of the affairs of the debtor by current management) or simply because the appointment is in the interests of the creditors or other relevant parties. 11 U.S.C. sec. 1104(a) (2006).

[*17] $1,255,000 in liabilities.  In January 2009 the Owens Trust and Vestin each began an adversary proceeding in bankruptcy court to determine the nature and extent of their respective interests in machinery, equipment, and fixtures.  Neither recovered anything by the time the bankruptcy case closed in December 2010.

    b.    Lohrey Investments

As we noted above, Vestin recorded a notice of default on the Gilroy property in August 2008.  Owens, as trustee of Owens Trust and member of the FLP, filed a notice of default for a portion of his loan by October.  He filed another, as trustee of Owens Trust, a week later.  Vestin then filed a notice of trustee sale on the Gilroy property.  The amount owed to Vestin at the time was almost $23 million.

The Gilroy property was Lohrey Investments' major asset, and by January 2009 it followed West Coast Linen into bankruptcy.  According to the filing, Lohrey Investments had liabilities of $44 million and assets of $14.5 million.  An operating report filed in March of that year revised these numbers--it showed assets worth $31 million and liabilities of $43 million.  That still meant insolvency, and maybe Owens had some hope of some recovery--the parties stipulated that he filed proofs of claim as the trustee of Owens Trust and as a

[*18] member of the FLP.[7] Things got even worse, however, and Lohrey Investments' bankruptcy, like West Coast Linen's, soon converted from a chapter 11 reorganization to a chapter 7 liquidation.

In the end the Gilroy property, water rights, and laundry equipment were sold for only $4.1 million--the proceeds of which were distributed pursuant to a settlement between the secured creditors. This bankruptcy closed in May 2012 and Owens recovered nothing.

c.     David Lohrey

For Lohrey, the end of the story came early in 2009. He had signed personal guaranties on all his loans, and he and his wife were forced into filing for bankruptcy themselves. Their assets totaled $2.8 million, but their liabilities exceeded $50 million. This bankruptcy proceeding also became a liquidation and led to their discharge a few months later. Lohrey--with a mispriced contract and a business hungry for capital at the worst possible time--became an example that not

---

[7] "A proof of claim is a written statement setting forth a creditor's claim." Fed. R. Bankr. P. 3001(a). A correctly executed and filed proof of claim in the bankruptcy court is taken to be *prima facie* evidence of both the validity and amount of the claim. Id. para. (f). Filing a proof a claim gives a debtor the right to participate in any distributions from the bankruptcy estate. 11 U.S.C. secs. 502(a), 726(a) (2006).

[*19] all entrepreneurial risks pay off, even with 35 years of hard work. Owens recovered nothing from this bankruptcy either. He didn't recover a penny.

C.    The Returns

We return to Owens--despite having some interest in these three related bankruptcy cases, he recovered not a cent through them. But they did at least generate a deduction. He turned to a CPA to prepare his returns for the 2008, 2009, and 2010 tax years. The same CPA also prepared amended returns for his 2003, 2004, and 2005 tax years. This CPA advised Owens that his loss on the loan with Lohrey Investments entitled him to a bad-debt deduction under section 166. Owens took this advice and claimed a $9.5 million bad-debt loss expense on his 2008 tax return. On the advice of his CPA, he also claimed an NOL carryforward for the 2009 and 2010 tax years and amended his 2003, 2004, and 2005 tax years to claim a carryback for those years. Owens also claimed a multitude of Schedule C deductions related to his personal lending business for the 2008 and 2009 tax years. The Commissioner determined to deny the bad-debt deduction and associated carrybacks and carryforwards in a single notice of deficiency. He also denied Owens the Schedule C deductions that he claimed. The total of the deficiencies is more than $3 million.

**[*20]** Owens was a California resident when he timely filed a petition. We tried the case in San Francisco.

## OPINION

We have three issues:

- Was Owens's lending from his personal funds a trade or business?;

- Did the loans he made to Lohrey Investments company constitute *bona fide* debt?; and

- Did that debt become worthless in 2008?

Owens argues that he has been in the business of making personal loans on a continual and regular basis for years. He also argues that the loans he made to Lohrey Investments created *bona fide* debts and that those debts then became wholly worthless in 2008 when West Coast Linen filed for bankruptcy after the trustee padlocked the building in Gilroy. The Commissioner doesn't think that Owens's lending activity amounted to a trade or business and even if it did, the Lohrey loans were more equity than debt. Even if they were debts, they didn't become worthless in the 2008 tax year.

These arguments all mirror section 166. That section allows a deduction for a *bona fide* debt that becomes worthless *within* a taxable year. Sec. 166(a); sec. 1.166-1(c), Income Tax Regs. It requires that:

[*21] ●  the debt be created or acquired in connection with the taxpayer's trade or business;

●  a *bona fide* debt existed between the taxpayer and his debtor; and

●  the debt became worthless in the year the bad debt deduction was claimed.

Id.; Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 284-85 (1990); Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), aff'd, 601 F.2d 734 (5th Cir. 1979).

We will discuss each requirement in turn.

## I.  Trade or Business

For Owens's moneylending activity to be considered a trade or business he must have been involved in the activity with continuity and regularity--with the primary purpose of earning income or making a profit.  See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Scallen v. Commissioner, T.C. Memo. 2002-294, 2002 WL 31684676, at *8-*9.  This is a question of fact, of course, but one whose recurrence in a great many cases has triggered the natural prongification reflex of judges trying to fit the case before them into a larger matrix of precedent.  We've developed a non-exhaustive list of facts and circumstances to consider in deciding whether a taxpayer is in the business of lending money:

[*22]
- the total number of loans made;

- the time period over which the loans were made;

- the adequacy and nature of the taxpayer's records;

- whether the loan activities were kept separate and apart from the taxpayer's other activities;

- whether the taxpayer sought out the lending business;

- the amount of time and effort expended in the lending activity; and

- the relationship between the taxpayer and his debtors.

Cooper v. Commissioner, T.C. Memo. 2015-191; Scallen v. Commissioner, 2002 WL 31684676, at *9.

The Commissioner first argues that even if Owens made enough loans over the years, his source of funds was the FLP and not himself personally. We find that Owens's personal lending activities were continuous and regular by themselves.[8] It is clear from the record that from 1999 through 2013 Owens personally (alone, or acting as trustee of Owens Trust) made at least 66 loans (including the Lohrey loans) to a multitude of borrowers, easily exceeding

---

[8] The Commissioner asserted in his brief that of 89 loans made between 1999 and 2013 on record, only 8 listed Owens as the lender. He implied that the remaining loans listed the FLP, but a number of the loans were made from Owens's personal trust.

**[*23]** $24 million. These figures are more than sufficient when compared to the benchmark we've set in other cases. Compare Serot v. Commissioner, T.C. Memo. 1994-532 (55 loans over 10 years totaling approximately $1.2 million shows business), aff'd, 74 F.3d 1227 (3d Cir. 1995), Ruppel v. Commissioner, T.C. Memo. 1987-248, 53 T.C.M. (CCH) 829 (1987) (27 loans over 4 years totaling just under $1.4 million shows business), and Jessup v. Commissioner, T.C. Memo. 1977-289 (31 loans over 10 years ranging from $315,000 to $2.7 million each year shows business), with Cooper v. Commissioner, T.C. Memo. 2015-191 (12 loans over 6 years not a business).

From 2003 through 2008--the most crucial years in this case--Owens made approximately 33 loans totaling over $21 million, including $17 million in Lohrey loans. This period was not unusual--money had been Owens's stock in trade since the first days of his career, and lending had long since become his vocation. We are convinced that, over the years, he had fallen into the understandable and prudent habit of lending money raised from the public through OFG to more secured and better risks; the riskier-but-still-promising loans he took on for himself.

The Commissioner reasonably points out that Owens did not personally maintain records regarding the loans he made--staff at OFG did that for him. OFG

[*24] treated documentation related to Owens's lending the same as it did its own: It kept a file for each loan that included the underwriting documentation, legal documentation, and any security agreements. OFG kept additional documentation when a borrower was in default, including correspondence, notices, and forbearance agreements. OFG also kept records of existing loans reflecting the balances, summary of payments, and due dates.

Should any of this count against Owens? We don't think so. Remember that the question we're asking is whether his personal lending was a trade or business. The answer to this question is more probably "yes" the more his personal-lending activity looks like the activity of a traditional lender--in contrast, say, to the activity of someone who writes a personal check to his brother-in-law and then bugs him about repaying it every so often. That Owens kept good records of his loans in exactly the same way OFG kept records on its loans very much suggests that Owens was treating his personal lending as a continual and regular activity.

We've addressed this issue before. For example, in Jessup, we concluded that the taxpayer was in the trade or business of lending money despite his decision not to maintain a separate office. Taking things a step further, in Ruppel, the taxpayer did not maintain a separate office and instead used employees at his

[*25] existing business to service the personal loans he made. We found that for the taxpayer to maintain a separate office under these circumstances "could be perceived as a needless expense which a prudent businessman would not incur." Ruppel v. Commissioner, 53 T.C.M. (CCH) at 834. That reasoning still makes sense to us 30 years later: OFG was the Owens family company, and Owens's use of OFG's office space and employees for the service of his personal loans-- especially given that OFG was a lending company and employees there already knew the business--is entirely consistent with his being in the trade or business of lending money.

The Commissioner next asserts that Owens failed to prove how much time he spent making personal loans. Owens testified that he generally spent an average of 50 hours at work each week and did not distinguish the time he spent on lending from his personal funds from the time he spent on lending from OFG's funds. We recognize this as an officially approved factor-to-be-considered but also find that the toilsome drudgery of measuring out one's days in six-minute increments is rarely found among our more entrepreneurial countrymen--they are more inclined to focus on getting the chore in front of them done as efficiently as possible than on keeping detailed time sheets. And on the facts of this case, we find, as we have in similar cases, that Owens had no need to bill specific hours on

**[*26]** his personal lending while managing OFG. See Jessup v. Commissioner, T.C. Memo. 1977-289. Just look at the number of loans Owens made and how much money he tied up in them--unless motivated by some hidden whimsy or charitable purpose, he spent a sufficient amount of time on them.

The Commissioner argues, and we do not disagree, that Owens did not advertise his availability to make personal loans. But we also find that he didn't need to any more than the taxpayers in Serot, Ruppel, and Jessup. He had a reputation in the community as a lender and was very well respected. It was clear from the credible testimony of his competition and colleagues that it was his personal reputation that brought borrowers to both OFG and him personally. It wasn't unusual for borrowers to call OFG and ask for Owens directly. We believe the testimony that the professional relationships[9] Owens developed with his borrowers also made it possible for him to continue lending to them.

---

[9] The Commissioner would disagree that Owens maintained purely professional relationships with his borrowers because some of those borrowers were businesses that he had an interest in. This includes Lohrey Investments. It appears from the record, though, that out of the 66 personal loans mentioned in the record, Owens had a personal interest in 3 borrowers but lent money to at least 13 others. He wasn't just lending to businesses in which he had an interest. Cf. Putoma Corp. v. Commissioner, 66 T.C. 652, 674 n.33, aff'd, 601 F.2d 734 (5th Cir. 1979).

[*27] The Commissioner's final argument focuses on Owens's relationship with Lohrey. He claims that a reasonable businessman in the lending business would not subordinate his loans to a third-party lender, especially when the borrower is underwater. But we've already found that given his options, Owens did act reasonably. We're being consistent here: In Ruppel the taxpayer continued to lend money to a borrower over time because he saw it as the only way to fully recoup his investment. It's easy in hindsight to argue that a lender who kept lending more money to a borrower who ultimately failed was unreasonable. But we try to look at things as the lender saw them at the time, and here we find that Owens's advancing more and more money to a growing and capital-intensive business was reasonable under the circumstances. It turned out to be a bad business decision, but it was a *business* decision and not charity or lunacy or something else.

We find that Owens lent from his personal funds continuously and regularly and did so with the purpose of making a profit. He was therefore in the trade or business of lending money during the years at issue.

II. *Bona Fide* Debt

That Owens was in the moneylending business is not by itself enough to make his failed loans to Lohrey deductible. He must also show that they were

[*28] *bona fide* debt. A *bona fide* debt is one that "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs. Whether a purported loan is a *bona fide* debt is determined by the facts and circumstances of each case. A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). This is an even more hyperprongified inquiry than whether an activity is a trade or business. And it can be even harder to figure out because the line between debt (deductible as an ordinary loss) and equity (deductible as a capital loss and even then subject to restrictions), see secs. 165(f), 1211(a) and 1212, is clearly blurry. The Ninth Circuit[10] has identified 11 factors to consider in a debt-equity analysis but strongly cautions us not to overemphasize any one of them. A.R. Lantz Co., 424 F.2d at 1333. We consider:

- the names given to the certificates evidencing the indebtedness;

- the presence or absence of a maturity date;

- the source of the payments;

- the right to enforce the payment of principal and interest;

- participation and management;

_____

[10] This case is appealable in the Ninth Circuit under section 7482(b)(1)(A).

**[\*29]** ● a status equal to or inferior to that of regular corporate creditors;

● the intent of the parties;

● "thin" or adequate capitalization;

● identity of interest between creditor and stock holder;

● payment of interest only out of "dividend" money; and

● the ability of the corporation to obtain loans from outside lending institutions.

Id. (quoting O. H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 125-126 (9th Cir. 1960)).  We will discuss each of these factors in turn, but we emphasize again that any one factor in this kind of multifactor test is useful only to the extent it enlightens us on an ultimate question of fact, in this case whether some or all of the advances that Owens made to Lohrey Investments were debt or equity.

A.   Names

Each of Owens's purported loans to Lohrey Investments--both before and after the 2005 operating agreement between the parties--was evidenced by "promissory notes."  This shows a general intent between Owens and Lohrey to form a genuine debt.  See Hardman v. United States, 827 F.2d 1409, 1412 (9th Cir. 1987); Bishop v. Commissioner, T.C. Memo. 2013-98, at \*15; PepsiCo Puerto

**[\*30]** <u>Rico, Inc. v. Commissioner</u>, T.C. Memo. 2012-269, at \*57.  This factor will weigh in favor of Owens.

B.    <u>Maturity Date</u>

"The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of debt obligation."  <u>Estate of Mixon v. United States</u>, 464 F.2d 394, 404 (5th Cir. 1972); <u>see also</u> <u>PepsiCo Puerto Rico, Inc. v. Commissioner</u>, T.C. Memo. 2012-269, at \*57.  And "[t]he absence of a fixed maturity date indicates that repayment is tied to the fortunes of the business."  <u>Hardman</u>, 827 F.2d at 1413.  The parties do not dispute that each promissory note included a maturity date.  The Commissioner argues, however, that this factor should still weigh against Owens because the dates were not enforced, but Owens credibly testified that he wanted to work with Lohrey and allow him time to improve his financial situation.  In <u>Bishop v. Commissioner</u>, T.C. Memo. 2013-98, at \*15, we had a similar situation:  The taxpayer did not exercise the acceleration clause under the note when the debtor stopped making payments because he thought that by giving the debtor a chance to recover from the real-estate crisis, the debtor would be able to resume payments.  We found this explanation reasonable then, and we find it reasonable now.  This factor will weigh in favor of Owens.

**[*31]** C.    Source of Payments

If the source of repayment is dependent on earnings, it is indicative of equity.  Hardman, 827 F.2d at 1413; Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 602-603 (1991); Provost v. Commissioner, T.C. Memo. 2000-177, 2000 WL 687889.  The Commissioner argues that because Lohrey Investments would be able to repay its debt to Owens only if Lohrey was able to improve West Coast Linen's financial status, repayment was *dependent* on earnings.  But this isn't how we use this factor.  If it were, there could only be investments in, and no lending to, distressed borrowers.  This just isn't the rule.  We recognize that there are types of debt that look very similar to equity and types of equity that look very similar to debt, but Owens was not close to this line here.  His advance of money to Lohrey Investments did have the goal of enabling that business to become profitable enough to repay its lenders, but the repayment of those advances was not *legally* contingent on success.  See Flint Indus., Inc. v. Commissioner, T.C. Memo. 2001-276, 2001 WL 1195725, at *12 ("When circumstances make it impossible to estimate when an advance will be repaid because repayment is contingent upon future profits or repayment is subject to a condition precedent, or where a condition may terminate or suspend the obligation to repay, an equity investment is indicated." (quoting Affiliated Research, Inc. v. United States, 173 Ct. Cl. 338

[*32] (1965))). As a *practical* matter, Owens's ability to be repaid would be harmed if Lohrey Investments and West Coast Linen failed, but as a *legal* matter Owens's advances were secured by a deed of trust on the Gilroy property, and Lohrey Investments was obliged to pay back the advances plus interest. This may be distressed debt, but it is debt nonetheless.

D.    Right to Enforcement

An enforceable and definite obligation to repay an advance indicates the existence of a *bona fide* debt. Hardman, 827 F.2d at 1413; Estate of Mixon, 464 F.2d at 405. The Commissioner does not dispute that Owens had a definite right, not contingent on Lohrey Investments' success, to enforce payment on his promissory notes. This factor weighs in Owens's favor.

E.    Participation in Management

When a taxpayer receives a right to participate in management, or some increase in ownership interest, in exchange for an advance, that participation tends to demonstrate that the advance was an equity investment--not a *bona fide* debt. Hardman, 827 F.2d at 1413; Am. Offshore, Inc. v. Commissioner, 97 T.C. at 603; Provost v. Commissioner, T.C. Memo. 2000-177. Here the Commissioner points to the interest Owens received in Lohrey Investments under the 2005 operating agreement. He argues that Owens received an interest in Lohrey Investments and

[*33] seems to argue that since the loans Owens made before he received his interest were unpaid, they must be equity. And as for subsequent advances--those must be equity investments as well. Owens said it was his understanding that the operating agreement gave him an option to convert his loans, or a portion of them, into equity. But we don't see that in the agreement, which instead provides that Owens's loans will *not* be treated as capital contributions to the company.

In Flint Indus., we considered a similar situation. There, the taxpayer-- which previously only oversaw its debtor's business operations--assumed a more direct role after it learned its debtor was in financial straits. We found the taxpayer's increased participation necessary to prevent the company's financial collapse. Like the taxpayer's increased participation in Flint Indus., Owens's possible ownership stake in Lohrey Investments was part of his efforts to make Lohrey Investments successful.

We specifically do *not* find that Owens received an ownership interest in Lohrey Investments *in exchange* for his previous advances. By that point it had been a year since Owens advanced any money to Lohrey Investments. After he acquired his interest, he didn't advance further funds until 2007--two years later. And the operating agreement does not indicate that Owens made a contribution at the time or note previous loans. Other cases show a more direct correlation. For

[*34] example, in Provost, the taxpayer demanded he have input on a project to ensure its success in direct exchange for an advance. Consequently, this factor is neutral.

F.    Status Equal or Inferior to Other Creditors

It is commonplace practice that equity participants take subordinate positions to creditors regarding rights to payments upon liquidation. Hardman, 827 F.2d at 1413; see also Estate of Mixon, 464 F.2d at 406; Am. Offshore, Inc. v. Commissioner, 97 T.C. at 603. Taking a subordinate position to other creditors indicates an equity investment. See PepsiCo Puerto Rico, Inc. v. Commissioner, T.C. Memo. 2012-269; CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16.

Owens unequivocally subordinated his advances to Vestin, but he did so only in an effort to recover his initial advances. While this factor does favor the Commissioner, it is not determinative. See PepsiCo Puerto Rico, Inc. v. Commissioner, T.C. Memo. 2012-269; see also Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C. Memo. 1998-121. Without additional financing from Vestin, Owens would not have seen a return. We've already found that given this particular set of circumstances, it was not unreasonable for Owens, in the course of his lending trade, to do so.

[*35] G.     The Parties' Intent

"[T]he inquiry of a court in resolving the debt-equity issue is primarily directed at ascertaining the intent of the parties". A.R. Lantz Co., 424 F.2d at 1333.  However, we must make a distinction between objective and subjective expressions of intent. Id.  Objectively speaking, the transactions between Owens and Lohrey Investments look like loans.  The language of the promissory notes contain typical loan language and give Owens typical creditor's rights.  The advances were documented by Owens's team as loans, and they were serviced as loans.  Lohrey credibly testified that he recorded Owens's advances as loans in his own books and records and signed under penalty of perjury a summary of schedules as part of Lohrey Investments' chapter 11 bankruptcy identifying the advances as debts.[11]

We find credible both Owens's and Lohrey's testimony on this issue. Lohrey testified that he wanted a lender for Lohrey Investments.  Owens treated Lohrey like a potential debtor from their first meeting:  He reviewed Lohrey's laundry business and had appraisals drawn up for the Gilroy property and business equipment.  The Commissioner argues that Owens didn't act like a regular lender

---

[11] Owens did get a K-1 from Lohrey Investments, and he reported, but did not claim, a loss in relation to it on his 2010 tax return.

**[*36]** when he later helped Lohrey Investments find additional funding, but we see nothing necessarily investor-like, and not creditor-like, here. Lohrey Investments had become distressed; distressed debtors need more capital or some other refinancing help to survive. And it's often in the creditor's interest to help find a solution lest his existing debt become even more distressed.

H.   "Thin" or Adequate Capitalization

There is caselaw that says advances to meet the daily needs of a corporation are indicative of *bona fide* indebtedness, see e.g., Shedd v. Commissioner, T.C. Memo. 2000-292, but this might be an especially loosey-goosey factor in an era where startups routinely use equity capital to pay operating expenses. But more cases say that thin capitalization is a strong indication of equity only if (1) the debt to equity ratio was initially high, (2) the parties realized that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations. Am. Offshore, Inc. v. Commissioner, 97 T.C. at 604. When Owens made his first loans to Lohrey Investments, they were adequately secured. Subsequent loans might not have been, but those were meant to protect Owens's initial advances, and we don't find they thereby became an equity investment. We also find based on credible testimony that neither Owens nor Lohrey had any reason to believe Lohrey

[*37] Investments would eventually take on so much additional debt. Both Owens and Lohrey gave credible testimony regarding their optimism about the market-- and the Great Recession caught many off guard. We do acknowledge that it is not clear from the record what Lohrey Investments used Owens's initial advances for. We know that at least part of Owens's initial advance was used to pay off another loan. But Lohrey did use subsequent advances to hire additional employees and purchase additional equipment and vehicles to meet the requirements of the highly anticipated Kaiser contract.

I.    Identity of Interest

Advances in proportion to the stockholder's capital interest will lead to a finding that the advance was an equity investment. Hardman, 827 F.2d at 1414; Am. Offshore, Inc. v. Commissioner, 97 T.C. at 604-605. We do not have sufficient evidence in the record to make a finding on this point. Neither party argued on brief that there was evidence in the record that directly supports or negates this factor, so we treat it as neutral. See, e.g., Provost v. Commissioner, 2000 WL 687889, at *8.

J.    Payment of Interest Out of "Dividend" Money

Similarly to factor 3 of this analysis, we look to the source of the payments. We focus though, on *how* the parties treated interest. See Am. Offshore, Inc. v.

[*38] Commissioner, 97 T.C. at 605. "The failure to insist on interest payments indicates that the payors are not expecting substantial interest income, but are more interested in the future earnings", which points to equity. Id. Lohrey Investments kept up with its payments until 2005. Owens allowed it to lapse and then even continued to make additional advances, but we've already found his actions reasonable given the circumstances and thus we will view this factor as neutral.

K.    The Ability of the Corporation To Obtain Loans From Outside Lending Institutions

If a corporation is able to borrow funds from an outside source at the time of the advance, the transaction looks more like a *bona fide* debt. Hardman, 827 F.2d at 1414; Am. Offshore, Inc. v. Commissioner, 97 T.C. at 605. The Commissioner mistakenly hinges his argument on Owens's subordination to Vestin, arguing *again* that this is not how a reasonable creditor behaves. What this factor requires us to look at, however, is whether at the time Owens made advances to Lohrey Investments, Lohrey Investments could have obtained financing from a different source on the same terms. See, e.g., Provost v. Commissioner, T.C. Memo. 2000-177. When Lohrey initially approached OFG it was because other lenders considered financing Lohrey Investments too risky. Yet, OFG--certainly a

**[*39]** legitimate lender--did provide financing.  Owens provided more.  Later,

Lohrey Investments was able to obtain still more debt financing from other

sources:  There was Vestin, for one, as well as lenders like Podium, Wells Fargo

Bank, and Tri-State.  These facts bolster a finding that the advances were *bona*

*fide* debt.

After looking at all these factors, we find that Owens's advances to Lohrey

Investments created *bona fide* debts.

Owens has only one more hurdle to clear.

III.    Worthless Debt

We've found that Owens was in the trade or business of lending money

during the years at issue, and we've found that his advances to Lohrey Investments

were *bona fide* debts.  Owens may therefore deduct these as worthless debt, but for

what year?  Owens says 2008.

The Commissioner disagrees.  This is also a question of fact.  Boehm v.

Commissioner, 326 U.S. 287, 293 (1945); Am. Offshore, Inc. v. Commissioner, 97

T.C. at 594.  When a debt is worthless should be determined objectively:

> It is obvious that there is no precise test for determining worth-
> lessness within the taxable year and neither the statutory enactment,
> its regulations, nor the decisions attempt such an all-inclusive
> definition. * * * Furthermore, it is often impossible to select a single

**[\*40]** factor or "identifiable event" which clearly establishes the time at
which a debt becomes worthless and thus deductible. * * *

Am. Offshore, Inc., 97 T.C. at 595 (quoting Minneapolis, St. Paul R.R. Co. v.

United States, 164 Ct. Cl. 226, 240 (1964)).  We are to consider all relevant

evidence.  Sec. 1.166-2(a), Income Tax Regs.  A taxpayer must show "identifiable

events that form the basis of reasonable grounds for abandoning any hope of

recovery."  Aston v. Commissioner, 109 T.C. 400, 415 (1997).  The Commissioner

contends that there is only one good "identifiable event" here--Lohrey

Investments' bankruptcy filing in 2009.[12]  While bankruptcy is certainly an

indication that a debt is worthless, the absence of a bankruptcy filing does not

mean a debt isn't worthless.  We have identified a multitude of objective criteria

that indicate a debt is worthless:

- a decline in the debtor's business;

- a decline in the value of the debtor's assets;

- overall business climate;

- serious financial hardship suffered by the debtor;

---

[12] Bankruptcy is an indication of *at least* part of an unsecured debt.  Sec. 1.166-2(c), Income Tax Regs.  Depending on the circumstances, a debt can become worthless before settlement.  Id. subpara. (2).  The Commissioner does not seem to dispute that Owens's debt at least became worthless in 2009 but that issue is not before us here.

[*41] • the debtor's earning capacity;

• events of default;

• insolvency of the debtor;

• the debtor's refusal to pay;

• actions taken by the creditor to pursue collection; and

• subsequent dealings between the creditor and debtor.

Am. Offshore, Inc. v. Commissioner, 97 T.C. at 594; see also Cooper v. Commissioner, at *6-*7.

Lohrey's laundry business had been struggling for many years despite promising opportunities. Once West Coast Linen filed for bankruptcy, and Lohrey was hung out to dry by the trustee, Owens knew Lohrey was doomed. The padlock on the door meant Lohrey was going to lose his primary client, and his reputation, with little hope for a comeback. Lohrey even told Owens that Lohrey Investments was going to file for bankruptcy in 2008. We find that this showed Lohrey Investments was not going to be able to repay its debt. And in a battle over collateral, Owens was going to lose to Vestin.

The Commissioner asserts that *Lohrey* still *believed* in 2008 that Lohrey Investments' equipment and property were worth more than its liabilities, and that without proof that Lohrey's subjective belief was not true, Owens's belief that he

[*42] would not recover anything on his loan to Lohrey Investments has no weight. We can think of no reason why we would give Lohrey's subjective belief at the time more merit than the facts and circumstances surrounding Owens's belief that the value of the property was "very small relative to the debt." In fact, we can take into consideration subsequent events to prove the reasonableness of this belief. Am. Offshore, Inc. v. Commissioner, 97 T.C. at 597. And Owens indeed did not recover in the bankruptcies: Lohrey Investments' liabilities towered over what the Gilroy Property, water rights, and equipment sold for. Owens recovered nothing.

Finally, the Commissioner argues that because Owens filed a proof of claim, he must have expected at least some recovery. While a proof of claim may indicate that a taxpayer had some hope for recovery, we are reluctant to determine the outcome of this case based on Owens's steps to secure his place in the order of distribution. "No single factor is conclusive as there are no absolutes in this area." Am. Offshore, Inc. v. Commissioner, 97 T.C. at 595. Looking to all the facts and circumstances, we find that Lohrey Investments' debt to Owens became worthless in 2008.

**[\*43]** IV.    <u>Conclusion</u>

Because Owens was involved in the trade of business of lending money during the years at issue and his advances to Lohrey Investments during the years constitute *bona fide* debt that became worthless in 2008, he is entitled to the claimed bad-debt deduction.  The Commissioner had additionally asserted section 6662 penalties for the 2008 and 2010 tax years, but we've found for Owens and thus this issue is moot.

<u>Decision will be entered under</u>

<u>Rule 155</u>.