# United States Tax Court

T.C. Memo. 2023-86

WILLIAM G. ALLEN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

HUMBOLT INVESTMENTS, LLC,
ALLEN FAMILY INVESTMENT TRUST U/A/D 12/1/03,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 28210-15, 31951-15.          Filed July 11, 2023.

————

*Richard A. Pelak* and *Jimmie W. Phillips, Jr.*, for petitioners.

*Kimberly B. Tyson* and *Scott Lyons*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, *Judge*: By statutory notice of deficiency dated August 11, 2015, the Internal Revenue Service (IRS or respondent) determined deficiencies in William G. Allen's federal income tax and accuracy-

[*2] related penalties pursuant to section 6662[1] for the 2005 and 2006 taxable years as follows:

| Year | Deficiency | § 6662 Penalty |
|------|-----------|----------------|
| 2005 | $2,646,969 | $529,394 |
| 2006 | 2,054,073 | 410,815 |

By a notice of final partnership administrative adjustment (FPAA) dated September 28, 2015, the IRS adjusted Humbolt Investments, LLC's (Humbolt) ordinary income for the 2009 taxable year, increasing it by $3,403,027.

After certain concessions, the issues remaining for decision are whether (1) Mr. Allen's businesses—Waterfront Development Services, Inc. (WDS), its disregarded entity, Waterfront Development Services I, LLC (WDS I), and Humbolt's TMP—are entitled to section 166 bad debt deductions in whole or in part for 2009 and (2) Mr. Allen is liable for section 6662 accuracy-related penalties for carrying back the section 166 deductions to 2005 and 2006 and thereby understating his income for those years. We resolve both issues in respondent's favor.

When the Petitions were timely filed, Mr. Allen resided in Florida and Humbolt's principal place of business was in North Carolina. These cases were consolidated for purposes of trial, briefing, and opinion pursuant to Rule 141(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts, the First Supplemental Stipulation of Facts, the Second Supplemental Stipulation of Facts, the Third Supplemental Stipulation of Facts, and the attached Exhibits are incorporated herein by this reference.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

**[\*3]** I.  *Mr. Allen's Background*

Mr. Allen has significant experience in the residential real estate industry. His experience includes acquiring, marketing, and selling large, single-family, residential lot developments in resort residential communities in the Southeast and in Texas. To effectively manage his real estate enterprise, Mr. Allen formed many different independent yet affiliated business entities. He owned or controlled each of the entities that made up his real estate enterprise.

Mr. Allen located land that he determined would be marketable and economically profitable for residential real estate developments. He used the business entities and trusts to manage, design, and market the properties as well as to obtain financing for each development project. Through these business entities, Mr. Allen coordinated lot sales for six bonded residential real estate developments (collectively, 2009 development projects): (1) Summerhouse at Everett Bay in North Carolina (Summerhouse Development), which was being developed by R.A. North Development I, Inc. (RAND I); (2) Cutter Bay in North Carolina (Cutter Bay Development), which was being developed by RR Development North III, LLC (RRDN III); (3) Beachside in Texas (Beachside Development), which was being developed by D.H. Palacios Development, L.P. (D.H. Palacios); (4) Sanctuary at Costa Grande in Texas (Sanctuary Development), which was being developed by D.H. Texas Development, L.P. (D.H. Texas Development); (5) Waterbridge in South Carolina (Waterbridge Development), which was being developed by South Carolina Coastal Development I, Inc. (SCCD I); and (6) Water Ridge in Florida (Water Ridge Development), which was being developed by R.A. Florida Development, Inc. (RAFD).

RAND I, RRDN III, D.H. Palacios, D.H. Texas Development, SCCD I, and RAFD (collectively, development companies) each entered into a Marketing, Sales, and Administrative Services Agreement (MSAS Agreement) with WDS to provide services for their respective development projects. The MSAS Agreements gave WDS the rights to (1) use marketing companies to market and sell undeveloped lots in each of the development projects and (2) use Waterfront Communities, Inc. (Waterfront Communities) (as further discussed *infra* p. 4), to provide administrative services for each of the development projects. WDS's agency fees ranged from 21.5% to 53.5% of gross proceeds from lot sales.

[*4] II.    *Mr. Allen's Real Estate Enterprise*

   A.    *Allen GST Investment Trust*

The Allen GST Investment Trust (GST Trust) is a qualified subchapter S trust for federal income tax purposes with a Nevada situs. At all relevant times, the primary beneficiaries of the GST Trust were Mr. Allen and his issue.  Mr. Allen was the family trustee of the GST Trust until June 17, 2009, when he resigned.  Thereafter, independent trustees were appointed yet had no involvement in the daily activities of GST Trust's business activities.

   1.    *The Waterfront Companies: WDS, WDS I, and Waterfront Communities*

The GST Trust wholly owned WDS, a Florida S corporation for federal income tax purposes.  WDS was created on September 13, 2004, and Mr. Allen was the president and an employee of WDS.  WDS wholly owned WDS I, a Florida limited liability company and disregarded entity for federal income tax purposes.  Mr. Allen was the sole manager of WDS I.

The GST Trust wholly owned Waterfront Communities, a North Carolina S corporation for federal income tax purposes.  Mr. Allen was the president of Waterfront Communities.

At all relevant times—and on the basis of its MSAS Agreement with each of the development companies—WDS entered into an Administrative Services Agreement with Waterfront Communities for each of the 2009 development projects to provide administrative services.  Mr. Allen agreed to pay Waterfront Communities an agency fee based on a percentage of the gross sale price of each lot sold.

   2.    *Contracts Between WDS, WDS I, and the Marketing Companies*

The GST Trust also wholly owned RR Development Group, LLC (RRDG), a Nevada limited liability company and disregarded entity for federal income tax purposes.  RRDG was used as an investment vehicle for the GST Trust.  Mr. Allen was the manager of RRDG.

RRDG owned (1) Southeastern Waterfront Marketing, Inc. (Southeastern Waterfront); (2) Waterfront Marketing, L.P.; (3) Waterfront Marketing, LLC (Waterfront Marketing); (4) Intracoastal

[*5] Land Sales, Inc. (Intracoastal); and (5) Florida Waterway Sales, Inc. (Florida Waterway). Water View Sales, Inc. (Water View), was owned 9% by Mr. Allen and 91% by the Allen Irrevocable Trust (10-31-02 Trust). These six companies are collectively referred to as the marketing companies.

In accordance with their agreements with the development companies, WDS and WDS I contracted with the marketing companies to provide marketing and sales services specific to each development project on the basis of their location and buyer demographics. WDS and WDS I agreed to pay each marketing company a fee based on a percentage of the gross sale price of each lot sold.

3. *The Marketing Companies*

a. *Southeastern Waterfront*

Southeastern Waterfront is a North Carolina S corporation for federal income tax purposes. As of 2009 Mr. Allen became the president of Southeastern Waterfront. In 2006 WDS contracted with Southeastern Waterfront to market, promote, and sell lots in the Summerhouse Development in North Carolina based on their MSAS Agreement with RAND I. WDS was expected to receive 10% of the gross sales as its fee. During 2009 and 2010 RAND I received a total of $698,469 in gross revenue from lot sales.

Similarly, in 2007 WDS contracted with Southeastern Waterfront to market, promote, and sell lots in the Cutter Bay Development in North Carolina based on their MSAS Agreement with RRDN III. WDS was expected to receive 20% of the gross sales as its fee. During 2007 and 2008 RRDN III received a total of $4,568,700 in gross revenue from lot sales.

b. *Waterfront Marketing, L.P.*

Waterfront Marketing, L.P., was a Texas limited partnership and disregarded entity for federal income tax purposes. Mr. Allen was the manager of Waterfront Marketing, L.P., before it merged with Waterfront Marketing.

From 2005 to 2006 WDS contracted with Waterfront Marketing, L.P., to market, promote, and sell lots in the Sanctuary Development in Texas based on their MSAS Agreement with D.H. Texas Development. WDS was expected to receive 20% of the gross sales as its fee. From

[*6] 2006 to 2010 D.H. Texas Development received a total of $96,798,541 in gross revenue from lot sales.

### c.    *Waterfront Marketing*

Waterfront Marketing is a Texas limited liability company and disregarded entity for federal income tax purposes. Mr. Allen was a co-manager of the company. From 2007 to 2010 WDS contracted with Waterfront Marketing to market, promote, and sell lots in the Beachside Development in Texas based on the MSAS Agreement with D.H. Palacios. WDS was expected to receive 20% of the gross sales as its fee. During 2007 and 2008 D.H. Palacios received a total of $10,095,318 in gross revenue from lot sales.

### d.    *Intracoastal*

Intracoastal is a South Carolina S corporation for federal income tax purposes. Mr. Allen was Intracoastal's president. From 2006 to 2009 WDS contracted with Intracoastal to market, promote, and sell lots in the Waterbridge Development in South Carolina based on the MSAS Agreement with SCCD I. WDS was expected to receive 12% of the gross sales as its fee. From 2006 to 2010 SCCD I received a total of $66,673,322 in gross revenue from lot sales.

### e.    *Florida Waterway*

Florida Waterway was a Florida S corporation for federal income tax purposes. Mr. Allen was Florida Waterway's president. From 2004 to 2009 WDS contracted with Florida Waterway to market, promote, and sell lots in the Water Ridge Development in Florida based on the MSAS Agreement with RAFD. WDS was expected to receive 10% of the gross sales as its fee. From 2005 to 2010 RAFD received a total of $70,580,864 in gross revenue from lot sales.

### f.    *Water View*

Water View is a South Carolina C corporation for federal income tax purposes and was owned 9% by Mr. Allen and 91% by the 10-31-02 Trust. Mr. Allen was the president of Water View.

### B.    *The Allen Family Investment Trust*

Mr. Allen's real estate enterprise consisted of multiple trusts, including the Allen Family Investment Trust. The Allen Family

[*7] Investment Trust has a Nevada situs, and the primary beneficiaries of the trust were Mr. Allen, Minok Lee Allen (his spouse), and Monica Lee Allen and William G. Allen, Jr. (his children).

C.     *Humbolt*

Humbolt is a Nevada limited liability company and is a partnership for federal income tax purposes. Because the return at issue was filed in 2009, Humbolt is governed by TEFRA.[2] Humbolt is owned 99% by the Allen Family Investment Trust and 1% by the GST Trust. Humbolt was formed in 2003 to lend money to entities and individuals involved in the residential real estate industry.

In 2009 Humbolt listed its principal business activity and principal product or service on its Form 1065, U.S. Return of Partnership Income, as real estate financing. Since May 2, 2004, Mr. Allen has been the manager of Humbolt.

D.     *Other Trusts and Entities Involved in Mr. Allen's Real Estate Enterprise*

1.     *6-8-05 Trust*

The 6-8-05 Trust is an irrevocable trust (with its situs unknown from the record), and the primary beneficiary of the trust was Jeanne Bell, Ms. Allen's sister. Nell Allen, Mr. Allen's mother, was the sole trustee of the trust.

2.     *9-30-02 Trust*

The 9-30-02 Trust is an irrevocable trust with a Nevada situs, and the primary beneficiaries of the trust were Mr. Allen's children and further issue. Mr. Allen was appointed the family trustee of the 9-30-02 Trust on January 1, 2009. Thereafter, independent trustees were appointed.

---

[2] The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, established unified procedures for the IRS examination of partnerships, rather than a separate examination for each partner. Although TEFRA was repealed by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101(a), (c)(1), (g), 129 Stat. 584, 625, 638, it still applies for partnership returns filed before that time.

**[\*8]**      3.      *6-28-02 Trust*

The 6-28-02 Trust is an irrevocable trust with a North Carolina situs, and the primary beneficiaries of the trust were Mr. Allen's sister-in-law, Kathy Allen, and the issue of Kathy Allen and Mr. Allen's brother, Randolph Allen.  At all relevant times, Graham Allen, Kathy and Randolph Allen's son and Mr. Allen's nephew, was the sole trustee of the 6-28-02 Trust.  The 6-28-02 Trust wholly owned Graham P.C. Florida, Inc. (Graham Florida), a Florida S corporation for federal income tax purposes; Marathon Land Developers, LLC (Marathon), a North Carolina limited liability company that was treated as a disregarded entity for federal income tax purposes; and Graham P.C. Investments, Inc. (Graham Investments), a North Carolina limited liability company that was treated as an S corporation for federal income tax purposes.  Graham Allen was the president of Graham Florida and the manager of Graham Investments.  Mr. Allen's spouse was the manager of Marathon until December 29, 2009, at which time Nancy Morrison was appointed Marathon's manager.

       4.      *9-2-98 Trust*

The 9-2-98 Trust is an irrevocable trust with a North Carolina situs, and the primary beneficiaries of the trust were Mr. Allen's children.  At all relevant times, Mr. Allen was the sole trustee of the 9-2-98 Trust.  The 9-2-98 Trust wholly owned ML&G Investments, Inc. (ML&G Investments), a North Carolina corporation that was treated as an S corporation for federal income tax purposes.  Mr. Allen was the president of ML&G Investments.

III.   *Purported Loan Transactions*

During the early 2000s, WDS, WDS I, and Humbolt issued purported loans to many of the related entities mentioned above.

WDS issued the following advances: (1) $460,000 to Waterfront Communities and (2) $424,631 to Carter Allen, Mr. Allen's now deceased brother and then sales representative.

WDS I issued the following advances: (1) $4,418,586 to Southeastern Waterfront; (2) $3,245,572 to Waterfront Marketing; (3) $773,160 to Intracoastal; (4) $518,196 to Florida Waterway; (5) $1,584,106 to RRDG; (6) $83,051 to Water View; (7) $15,000 to Waterfront Communities; (8) $629,331 to Marathon; (9) $1,630,000 to the 9-30-02 Trust; (10) $30,000 to Graham Florida; (11) $661,737 to

[*9] ML&G Investments; (12) $2,000 to Carter Allen; and (13) $46,875 to Dustin Calderon, a sales representative.

Humbolt issued the following advances: (1) $729,804 to D.H. Palacios; (2) $350,000 to RRDN III; (3) $245,400 to Graham Florida; (4) $205,000 to Graham Investments; (5) $57,500 to the 6-8-05 Trust; and (6) $1,815,323 to Marathon.

The parties who received advances did not (1) complete loan applications for any of the loans they received; (2) have earnings; or (3) pay interest on any of the purported debts. Despite receiving no interest payments, neither WDS nor WDS I made any demands for repayment or issued notices of default for any amounts.

IV.    *Tax Reporting of Mr. Allen, WDS, and Humbolt*

A.    *Mr. Allen*

On or about February 18, 2010, Mr. Allen prepared and timely filed his original 2009 Form 1040, U.S. Individual Income Tax Return. After filing his original 2009 Form 1040, Mr. Allen filed Form 1045, Application for Tentative Refund, on February 24, 2010, to claim $28,427,903 in net operating loss carryback deductions for 2004–06. The IRS sent Mr. Allen a letter denying this request and informing him that "[t]here was no election statement to verify [his] 5 year carryback." The IRS further stated that "the election must state that you are electing to apply Section 172(b)(1)(H) under Rev. Proc. 2009-52, and that you are not a TARP recipient . . . . The statement must specify the length of the NOL carryback period that you are electing." The IRS also stated that "[t]he 2004 figures do not match our records, to process your carryback application these figures must match, it appears the 1040X Amended Return for 2004 was not processed."

After receiving the IRS's letter, Mr. Allen filed a second 2009 Form 1045 with the IRS on April 22, 2010. The second 2009 Form 1045 claimed the same $28,427,903 in net operating loss carryback deductions for 2004–06.

After filing the original 2009 Form 1040, the original 2009 Form 1045, and the second 2009 Form 1045, Mr. Allen filed with the IRS a separate, superseding Form 1040 for 2009 on or about October 11, 2010. The IRS did not process the superseding 2009 Form 1040.

**[\*10]** On October 11, 2010, Mr. Allen filed with the IRS a third 2009 Form 1045. As on the first and second 2009 Forms 1045, Mr. Allen claimed net operating loss carryback deductions for 2004–06. On the third 2009 Form 1045, Mr. Allen claimed $27,185,388 instead of $28,427,903.

Meanwhile, the IRS sent Mr. Allen a letter notifying him that his original 2009 Form 1040 was being evaluated "to determine whether it will be examined or accepted without examination. The tentative refund or claim amount is in excess of $2,000,000." The IRS included an information document request describing certain documents that needed to be provided.

Ultimately, during the examination the IRS revenue agent determined that Mr. Allen had understated his income and was subject to accuracy-related penalties for 2005 and 2006. The IRS revenue agent obtained written supervisory approval for these penalties on August 30, 2013.

B. *WDS*

WDS filed its 2009 Form 1120S, U.S. Income Tax Return for an S Corporation, on or about September 16, 2010. On this return WDS claimed section 166 bad debt deductions of (1) $460,000 for Waterfront Communities and (2) $424,631 for Carter Allen.

On this return WDS also claimed section 166 bad debt deductions for WDS I of (1) $4,418,586 for Southeastern Waterfront; (2) $3,245,572 for Waterfront Marketing; (3) $773,160 for Intracoastal; (4) $518,196 for Florida Waterway; (5) $1,584,106 for RRDG; (6) $83,051 for Water View; (7) $15,000 for Waterfront Communities; (8) $629,331 for Marathon; (9) $1,630,000 for the 9-30-02 Trust; (10) $30,000 for Graham Florida; (11) $661,737 for ML&G Investments; (12) $2,000 for Carter Allen; and (13) $46,875 for Dustin Calderon.

WDS claimed a total of $14,522,246 in section 166 bad debt deductions. All of these deductions flowed through the GST Trust to Mr. Allen's individual tax return.

C. *Humbolt*

Humbolt filed its 2009 Form 1065 electronically on June 15, 2010. On this return Humbolt claimed section 166 bad debt deductions of (1) $350,000 for RRDN III; (2) $729,804 for D.H. Palacios; (3) $1,815,323

[*11] for Marathon; (4) $205,000 for Graham Investments; (5) 245,400 for Graham Florida; and (6) 57,500 for the 6-8-05 Trust.

Humbolt claimed a total of $3,403,027 in section 166 bad debt deductions.

## V.     *Notice of Deficiency and FPAA*

On August 11, 2015, the IRS sent Mr. Allen a notice of deficiency determining increases in tax of $2,646,969 for 2005 and $2,054,073 for 2006. The notice of deficiency also determined he was liable for accuracy-related penaltites for substantial understatements of income tax under section 6662(a) and (b)(2) of $529,394 for 2005 and $410,815 for 2006. The notice of deficiency disallowed $14,522,246 of bad debt deductions claimed on WDS's 2009 return.

On September 28, 2015, through an FPAA, the IRS notified the Allen Family Investment Trust as tax matters partner for Humbolt that it was disallowing all of the section 166 bad debt deductions claimed on its 2009 return.

## OPINION

These consolidated cases present two main issues: whether (1) the advances to the affiliated companies constituted debt or equity[3] and (2) Mr. Allen is liable for accuracy-related penalties. We address these questions in turn.

## I.     *Burden of Proof*

Generally, the Commissioner's determinations set forth in a notice of deficiency and an FPAA are presumed correct and, except for the burden of production in any court proceeding with respect to an individual's liability for any "penalty, addition to tax, or additional amount," *see* § 7491(c), the taxpayer bears the burden of proving otherwise, *see* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Furthermore, tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); *Segel v. Commissioner*, 89 T.C. 816, 842 (1987). As relevant here, this burden

---

[3] Because we find that the advances constituted equity—and not debt—we decline to analyze whether the sums were wholly or partially worthless.

**[\*12]** requires the taxpayer to demonstrate that the deductions claimed are allowable pursuant to some statutory provision and to substantiate by producing adequate records that enable the Commissioner to determine the taxpayer's correct liability. § 6001; *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

If the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his federal income tax liability and meets certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. *See* § 7491(a)(1) and (2). Petitioners do not contend, and the evidence does not establish, that the burden of proof shifts to respondent under section 7491(a)(1) and (2) as to any issue of fact.

II.    *Section 166 Bad Debt Deduction*

A.    *General Legal Principles*

A taxpayer is allowed as a deduction any bona fide business debt which becomes worthless in whole or in part within a taxable year. *See* § 166(a); *Shaw v. Commissioner*, T.C. Memo. 2013-170, at \*8, *aff'd*, 623 F. App'x 467 (9th Cir. 2015); Treas. Reg. § 1.166-1(a)(1). Section 166(a)(1) does not, however, apply to a nonbusiness debt held by a taxpayer other than a corporation; instead, the taxpayer is allowed a short-term capital loss deduction for the taxable year in which the debt becomes worthless. *See* §§ 166(d)(1), 1211(b); Treas. Reg. § 1.166-5(a)(2).

Only a bona fide debt qualifies for purposes of section 166. Treas. Reg. § 1.166-1(c). A debt is bona fide if at the time the funds were advanced the parties, in good faith, had an actual intent to create "a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." *Ellinger v. United States*, 470 F.3d 1325, 1333 (11th Cir. 2006) (quoting Treas. Reg. § 1.166-1(c)).

A business debt is "a debt created or acquired . . . in connection with a trade or business of the taxpayer" or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." § 166(d)(2); *see also Bercy v. Commissioner*, T.C. Memo. 2019-118, at 11–12; *Rutter v. Commissioner*, T.C. Memo. 2017-174, at \*14. It is undisputed that petitioners engaged in a trade or business.

**[\*13]** A gift or contribution to capital is not considered a "debt" for purposes of section 166. *Kean v. Commissioner*, 91 T.C. 575, 594 (1988); *Rutter*, T.C. Memo. 2017-174, at \*14; *see also* Treas. Reg § 1.166-1(c). Capital contributions are considered equity. *Am. Underwriters, Inc. v. Commissioner*, T.C. Memo. 1996-548, slip op. at 13.

A monetary transfer made between affiliated parties is subject to special scrutiny; however, having an affiliate relationship alone does not necessarily mean the transfer lacks economic substance. *Id.*, slip op. at 16. Monetary transfers between family members are presumed to be a gift and "are subject to rigid scrutiny and particularly susceptible to a finding that a transfer was intended as a gift rather than a debt." *VHC, Inc. & Subs. v. Commissioner*, T.C. Memo. 2017-220, at \*52–53 (citing *Estate of Van Anda v. Commissioner*, 12 T.C. 1158, 1162 (1949), *aff'd per curiam*, 192 F.2d 391 (2d Cir. 1951)), *aff'd*, 968 F.3d 839 (7th Cir. 2020). Whether an advance of funds is, in substance, a bona fide worthless business debt and deductible under section 166(a) is a question of fact to be decided on the basis of all relevant facts and circumstances of each case. *Id.* at \*52, \*82; *Rutter*, T.C. Memo. 2017-174, at \*14.

Accordingly, to properly claim a section 166 bad debt deduction, the taxpayer must establish that he intended to create a debtor-creditor status and that a genuine debt exists. *Clark v. Commissioner*, 18 T.C. 780, 783 (1952), *aff'd per curiam*, 205 F.2d 353 (2d Cir. 1953). The taxpayer must then show that the debt became wholly or partially worthless during the taxable year. *Dustin v. Commissioner*, 53 T.C. 491, 501–02 (1969), *aff'd*, 467 F.2d 47 (9th Cir. 1972).

Because Humbolt, WDS, and WDS I advanced funds to affiliated entities as well as directly and indirectly to family members of Mr. Allen, we examine the transfers with heightened scrutiny. *See VHC, Inc.*, T.C. Memo. 2017-220, at \*52.

B.     *Tests for Evaluating Debt Versus Equity*

Petitioners assert that all of the advances made to the purported debtors were bona fide business debts pursuant to section 166(a)(1). Respondent disagrees.

"We determine whether a purported debt is in substance and fact a debt for tax purposes from the facts and circumstances of each case, with the taxpayer bearing the burden of proof." *VHC, Inc.*, T.C. Memo. 2017-220, at \*52 (first citing *Arlington Park Jockey Club, Inc. v. Sauber*, 262 F.2d 902, 905 (7th Cir. 1959); and then citing *Dixie Dairies Corp. v.*

**[\*14]** *Commissioner*, 74 T.C. 476, 493 (1980)).  For a bona fide debt to exist, the parties to a transaction must have had an actual, good-faith intent to establish a debtor-creditor relationship at the time the funds were advanced.  *Beaver v. Commissioner*, 55 T.C. 85, 91 (1970).

An intent to establish a debtor-creditor relationship exists if the debtor intends to repay the loan and the creditor intends to enforce repayment.  *Fisher v. Commissioner*, 54 T.C. 905, 909–10 (1970).  The expectation of repayment must not "depend solely on the success of the borrower's venture."  *Am. Processing & Sales Co. v. United States*, 371 F.2d 842, 856 (Ct. Cl. 1967).  For that matter "[a]dvances made by an investor to a closely held or controlled corporation may properly be characterized, not as a bona fide loan, but as a capital contribution."  *See Shaw*, T.C. Memo. 2013-170, at \*9 (citing *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968)).

Absent stipulation to the contrary, we follow the relevant precedent of the court of appeals to which an appeal would generally lie.  *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).  In these cases the appeal would lie in the U.S. Court of Appeals for the Fourth and the Eleventh Circuits, which use slightly different methods to determine the parties' intent.  *See Fairchild Dornier GMBH v. Off. Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 233–34 (4th Cir. 2006); *Lane v. United States (In re Lane)*, 742 F.2d 1311, 1314–15 (11th Cir. 1984).

The Eleventh Circuit has approved use of certain guidelines to facilitate a determination of whether advances constitute debt or equity.  There are at least 13 factors which merit consideration in determining this issue: (1) names given to the certificates evidencing the indebtedness; (2) presence or absence of a fixed maturity date; (3) source of payments; (4) right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) status of the contribution in relation to regular corporate creditors; (7) intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) ability of the corporation to obtain loans from outside lending institutions; (12) extent to which the advance was used to acquire capital assets; and (13) failure of the debtor to repay on the due date or seek a postponement.  *Lane*, 742 F.2d at 1314–15 (citing *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972)).  The Eleventh Circuit has stressed that "these guidelines are not rigid rules mandating a particular conclusion when the court finds certain facts."  *Id.* at 1315;

**[\*15]** *see also Tyler v. Tomlinson*, 414 F.2d 844, 848 (5th Cir. 1969) ("[T]ests are, at most, helpful factors to be considered and not fiats to be bound by." (quoting *Ga. S. & Fla. Ry. Co. v. Alt. Coast Line R.R. Co.*, 373 F.2d 493, 498 (5th Cir. 1967))).

While the Fourth Circuit has not adopted the *Mixon* factors, it has used a similar test for determining whether a claim should be recharacterized from debt to equity under the Bankruptcy Code. *See Fairchild Dornier GMBH*, 453 F.3d at 233–34 (citing *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 749–50 (6th Cir. 2001)); *see also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Lane & Roderick, Inc.*, 736 F. App'x 400 (4th Cir. 2018). There are 11 nonexclusive factors: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *See Fairchild Dornier GMBH*, 453 F.3d at 233.

Regardless of the factors employed, both the Fourth and the Eleventh Circuits recognize that "[t]he substance of all of these multi-factor tests is identical," and application of the factors is helpful but what is necessary is evaluating the factors selected by the court to determine the taxpayer's intent concerning a transaction. *Id.* at 234 n.6; *see also Lane*, 742 F.2d at 1315 (citing *Tyler*, 414 F.2d at 848). Because the *Mixon* factors used in the Eleventh Circuit are more expansive, we will use them for the analysis.

III.   *Application of the Mixon Factors: Criteria for Bona Fide Debt*

A.     *Names Given to the Certificates Evidencing Indebtedness*

Focusing on the first factor, the names on the certificates evidencing indebtedness, we accord greater weight to the economic substance of a transaction than to its form. *See Rutter*, T.C. Memo. 2017-174, at \*16–17 (citing *Estate of Reynolds v. Commissioner*, 55 T.C. 172, 201–02 (1970)). With this factor, we consider the type of instrument

**[\*16]** evidencing the advance. *Hardman v. United States*, 827 F.2d 1409, 1412 (9th Cir. 1987); *Rutter*, T.C. Memo. 2017-174, at \*18. Issuance of a stock certificate indicates an equitable contribution, and issuance of a note is indicative of bona fide indebtedness. *Estate of Mixon*, 464 F.2d at 403; *see also Kean*, 91 T.C. at 595–96.

Humbolt, WDS, and WDS I memorialized their advances by issuing to each recipient a "Future Advance Promissory Note," "Second Note Modification Agreement," "Assignment of Future Advance Promissory Note," or "Promissory Note." Petitioners assert that these memorializations indicate bona fide indebtedness. Respondent disagrees because the advances were made among related parties: the GST Trust and the Allen Family Investment Trust—the beneficiaries of which were Mr. Allen and his family—which together are wholly owned by Humbolt, WDS, and WDS I. The GST Trust also wholly owned all of the entities that received advances.

Although evidence of formal debt instruments is indicative of a true debt, a genuine debtor-creditor relationship must be accompanied by "more than the existence of corporate paper encrusted with the appropriate nomenclature captions." *VHC, Inc.*, T.C. Memo. 2017-220, at \*54–55 (quoting *Tyler*, 414 F.2d at 850). This is especially true in the context of related-party transactions. *See Piedmont Mins. Co. v. United States*, 294 F. Supp. 1040, 1045 (M.D.N.C. 1969) (noting that advances to closely held corporations constitute bona fide debts where they are made for a valid business purpose besides avoiding taxes), *aff'd*, 429 F.2d 560 (4th Cir. 1970). Because Humbolt, WDS, and WDS I advanced funds to affiliated entities as well as to family members both directly and indirectly, we examine the transfers with special scrutiny.

Petitioners assert that the advances made to the marketing companies and Waterfront Communities (purported debtors) were to finance marketing and administrative services for each of the 2009 development projects. They claim that this fulfilled a valid business purpose and so the transfers should stand despite there being a relatedness issue.

Respondent counters that we should disregard the promissory notes as objective evidence because the purported debtors did not properly obtain the funds. To that point, the recipient entities' organizing documents restricted the amount of debt that could be incurred and required board approval. Respondent says that no board resolutions approving the increased debt obligations were entered into

[*17] evidence. As well, respondent argues, Humbolt modified the terms of the new promissory notes without agreement by the purported debtors.

We find these arguments compelling as they indicate a general lack of formalities in executing and fulfilling contractual obligations. This factor however only questions whether formal lending documents were in place. They were. As well, since the agreements—which were made between related parties—also had a valid business purpose, they withstand the heightened scrutiny we are required to apply here. This factor weighs in favor of debt.

### B. *Presence or Absence of a Fixed Maturity Date*

The second factor we consider is the presence or absence of a fixed maturity date. *Estate of Mixon*, 464 F.2d at 404. Generally, an advance issued with a fixed maturity date is indicative of an obligation to repay, a characteristic that supports a bona fide debt. *Id.* Conversely, the absence of a fixed maturity date indicates that repayment depends on the borrower's success, which signifies that the advance is likely equity. *See id.*; *see also Hardman*, 827 F.2d at 1413 ("The absence of a fixed maturity date indicates that repayment is tied to the fortunes of the business."). Similarly, an advance made with a fixed maturity date that has been postponed for prolonged periods suggests that "the nominal lender does not intend to require repayment and that the transfers are equity." *Laidlaw Transp., Inc. v. Commissioner*, T.C. Memo. 1998-232, slip op. at 59.

Each note that was issued by Mr. Allen, or one of his business entities or trusts, identified a fixed maturity date between five to nine years after the date of issuance. The maturity dates were applied to original promissory notes and to modified promissory notes. Petitioners say that the purported debtors issued new notes in late 2008 and early 2009 with substantially similar terms. And the modifications were agreed to because the belief was that the recession was nearly over and therefore a reasonable modification would increase the likelihood of repayment.

This Court has previously held that modifying the terms of an original note with similar terms does not remove the original note's character as a genuine bona fide debt if the modification is reasonable under the circumstances. *Green Bay Structural Steel, Inc. v. Commissioner*, 53 T.C. 451, 457 (1969). We have further held that

**[\*18]** extending the date of maturity to allow a debtor the opportunity to improve its financial situation is reasonable. *See id.*; *see also Owens v. Commissioner*, T.C. Memo. 2017-157, at \*30. Therefore, the fact that the promissory notes were modified does not undercut the reality that they included fixed maturity dates. This factor thus weighs in favor of characterizing the advances as bona fide debt.

### C.    *Source of Payments*

Repayment based solely on the expectation of corporate earnings or the success of the borrower's business is more likely to be characterized as an equitable contribution rather than a bona fide debt, regardless of its reasonableness. *Ellinger*, 470 F.3d at 1335; *Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625, 631 (6th Cir. 1986), *aff'g* T.C. Memo. 1985-58; *Lane*, 742 F.2d at 1314; *Estate of Mixon*, 464 F.2d at 405. Mr. Allen conceded that each of the development companies agreed to pay WDS a percentage of the gross sale price for each lot sold from the 2009 real estate development projects on the basis of the MSAS Agreement. And at trial he confirmed that repayment of the purported loans was dependent on lot sales, which he identified as "cash flow or revenue."

Petitioners argue that this factor still weighs in their favor because repayment was not "legally contingent" on the purported debtor's success. This argument is not persuasive. Neither the Fourth nor the Eleventh Circuit requires the source of repayment to be "legally contingent" on a debtor's success. *See, e.g.*, *Ellinger*, 470 F.3d at 1335; *Lane*, 742 F.2d at 1314. Because repayment of the loans was dependent on lot sales, this factor supports characterizing the advances as equity.

### D.    *Right to Enforce Payment of Principal and Interest*

An advance with a definite obligation to repay a fixed or determinable sum of money provides some indicia of a bona fide debt. *Estate of Mixon*, 464 F.2d at 405. This factor however is not an exception to the substance over form doctrine. Despite the plain text of a note, this Court has held that the "economic reality provides the touchstone" for determining whether an advance of funds constitutes a bona fide debt. *Shaw*, T.C. Memo. 2013-170, at \*10. And the fact that the lender has an enforceable right to payment but "t[akes] none of the customary steps . . . [to] assure repayment" supports the conclusion that the advances constitute equity. *Lane*, 742 F.2d at 1317.

[*19] The parties concede that in form Humbolt, WDS, and WDS I had an enforceable right to payment. Respondent however argues that in substance this was an equity infusion. We agree. Although Humbolt, WDS, and WDS I indeed had the legal right to enforce payment, they clearly did not. They never made written demand on the purported debtors and never collected interest from any of them. Additionally, and similarly to the taxpayer's notes in *Lane*, the notes here did not create realistic creditor safeguards: They did not have a sinking fund from which payments of principal and interest might be made, and the notes were unsecured, despite having fixed maturity dates. *Id.* (citing *Tyler*, 414 F.2d at 849). *But cf. Mills v. I.R.S.*, 840 F.2d 229, 233 (4th Cir. 1988) ("Related corporations . . . do not provide for sinking funds . . . [n]or do they ordinarily set up fixed repayment schedules . . . ."), *rev'g* T.C. Memo. 1986-94.

Petitioners rely on the past repayment history of affiliated loans by Humbolt, WDS, and WDS I to support their argument that the purported debtors in these cases would also have consistent payment histories. This argument is unsupported. Even if we rely on these past payment histories, the purported debtors in these cases had little or negative income. They relied solely on projected cashflow to repay the loans at issue. Still, knowing this reality and never having received payments of interest or principal, the maturity dates on the loans were extended.

Petitioners additionally argue that demand letters did not need to be sent to the purported debtors because of their affiliated relationship to them. They assert that *Dynamo Holdings Limited Partnership v. Commissioner*, T.C. Memo. 2018-61, supports their argument. In *Dynamo Holdings*, the Commissioner argued that the transfers were gifts—not equity as in these cases—and so we applied a different test from the one we apply here. *Id.* at *50–51. Still, in finding that the parties had entered into a bona fide debtor-creditor relationship, we noted that "related-party demand notes are afforded little weight." *Id.* at *59. We stated further that the "these formal indicia of debt are little more than declarations of intent without accompanying objective economic indicia of debt." *Id.*

That logic applies here as well. True, Humbolt, WDS, and WDS I had a contractual right to enforce the payments. And it is clear that they advanced funds to affiliated entities as well as to family members, both directly and indirectly. Any formal demand for payment then is not determinative to our analysis. The economic reality of the situation

**[\*20]** is that the advance recipients had no ability to repay the debts. Therefore although there was an enforceable right in form, there was not one in substance. This factor weighs in favor of equity.

E.  *Participation in Management*

If as a result of an advance the lender receives an increase in the business's management, the advance indicates an equitable contribution rather than a debt. *Stinnett's Pontiac Serv., Inc. v. Commissioner*, 730 F.2d 634, 639 (11th Cir. 1984), *aff'g* T.C. Memo. 1982-314; *Estate of Mixon*, 464 F.2d at 406. The parties have stipulated the formation of Mr. Allen's real estate business enterprise. They acknowledge that Mr. Allen either wholly or partially owned or managed each of the purported debtors by some direct or indirect interest.

Respondent contends that this alone is sufficient to weigh the factor in his favor. This factor however asks whether any *increased* voting power or participation was granted "by virtue of the advance." *Estate of Mixon*, 464 F.2d at 406. And since Mr. Allen was already (either directly or indirectly) at the helm of the purported debtors before the advances were made, there can be no increase by virtue of the advances. This factor therefore weighs in favor of debt.

F.  *Status of the Contribution in Relation to Regular Corporate Creditors*

An advance made to a purported debtor that expressly or implicitly becomes subordinate or inferior to the claims of other creditors may be characterized as equity rather than debt. *Id.* Nevertheless, subordination does not necessarily indicate equity when an advance is given priority over the claims of shareholders. *Id.*

The parties seem to agree that neither Humbolt nor WDS or WDI I subordinated their priority of payment on the general advances made to the purported debtors. But the two development companies, RRDN III and D.H. Palacios, took on secured debt to fund capital acquisitions. This secured debt took greater priority over the unsecured advances.

The other 13 purported debtors did not have secured debt. And the record does not provide any persuasive evidence on the order of priority of the debts of Humbolt, WDS, and WDS I versus those of other creditors, if there were any. In such a case the Court has looked to whether the purported creditor received a share of the proceeds from a sale for which the advance was made. *Am. Underwriters*, T.C. Memo.

[*21] 1996-548, slip op. at 23 (holding that even though priority of a taxpayer's debts was uncertain, because "[the taxpayer] . . . receive[d] . . . [a] share of the proceeds from [the] sale of its real estate . . . [the taxpayer] held a claim to repayment that was greater than . . . creditors"). Here, agreements were in place that entitled those companies to a gross percentage of the purported debtors' lot sales. So they would have had priority over other creditors with that entitlement.

Taken together, we see that two of the purported debtors had secured debts. These would have taken priority over the claims of Humbolt, WDS, and WDS I. We also see that the remaining companies did not have secured debts though we are not certain of their priority schedule vis-a-vis other creditors. Still, the fact that these other companies were obligated to pay Humbolt, WDS, and WDS I a portion of their gross sales indicates that the latter did have some priority. On the basis of these conflicting points, we find that this factor weighs neutral towards the analysis.

G. *Intent of the Parties*

The intent of the parties to create a bona fide debt is examined objectively. *Estate of Mixon*, 464 F.2d at 407; *NA Gen. P'ship & Subs. v. Commissioner*, T.C. Memo. 2012-172, slip op. at 25. We must look beyond the parties' self-serving declarations and, instead, analyze whether they had a reasonable expectation of repayment, whether their intentions comported with the economic reality of the debtor-creditor relationship, and how they treated the relevant documents and agreements. *See Lane*, 742 F.2d at 1316; *Tyler*, 414 F.2d at 850; *Tribune Media Co. v. Commissioner*, T.C. Memo. 2021-122, at *74 (citing *PepsiCo P.R., Inc. v. Commissioner*, T.C. Memo. 2012-269, at *88). This is an important factor. *Tribune Media Co.*, T.C. Memo. 2021-122, at *74; *Laidlaw Transp., Inc.*, T.C. Memo. 1998-232, slip op. at 66.

Petitioners contend that Mr. Allen intended at all times for the funds advanced to be bona fide loans. Respondent disagrees and asserts instead that Mr. Allen's business purpose was to infuse capital into recipient companies and then redistribute those funds to himself and his related business entities as equity.

The objective facts in the record suggest that the purported loans complied with the formal indicia of bona fide debt. The parties stipulated that each advance was documented by a promissory note or future advance promissory note and required interest to be paid on a

**[*22]** stated maturity date. Additionally, each advance was recorded on unaudited balance sheets, amortization schedules, general ledgers, and federal income tax returns as either a "loan," "loan receivable," or "commission receivable."

Petitioners further contend that the record supports a finding of bona fide debt based on the following: (1) each purported debtor reported cancellation of indebtedness income on their federal income tax returns; (2) many of the purported debtors repaid the advances, as evidenced by the fact that WDS and Humbolt received over $26 million and $12 million in repayments, respectively; (3) WDS and Humbolt received over $465,000 and $2.7 million in interest income, respectively; and (4) the advances were made before the end of January 2009 when it was still reasonable to expect repayment.

While petitioners' contentions are persuasive, determining intent is an objective inquiry that is based on all the facts and circumstances in each case, and formalities should be given minimal consideration in related-party transactions. *VHC, Inc.*, T.C. Memo. 2017-220, at *55–56 ("[P]romissory notes and bookkeeping entries should be given little weight unless supported by some other objective evidence . . . especially on account of the familial relationship."); *Rutter*, T.C. Memo. 2017-174, at *25.

Other objective facts suggest that the parties did not intend for the advances to be bona fide debts. For example, respondent asserts that none of the purported debtors made interest payments. And although some of the purported debtors duly made principal payments, there is no consistency across the group. Several of the companies—Marathon, Waterfront Communities, and Florida Waterways—made only nominal principal repayments. And others—Intracoastal, the Allen Irrevocable Trust, ML&G Investments, RRDN III, and Graham Florida—did not make any principal payments. Respondent says this failure is consistent with the purported debtors' financial status—they had no ability to repay the advances—and their relation to Humbolt, WDS, and WDS I. Respondent further contends that some of these companies continued to receive advances even after Mr. Allen and Humbolt claimed the bad debt deductions at issue.

On the basis of the foregoing, it is apparent that the advances were documented to appear to be bona fide debts. The facts however indicate that there was no real expectation of repayment. This is evidenced by the complete lack of interest payments and inconsistent

[*23] repayment of the principal. As well, although the advances may have slowed before January 2009, they were still made after Mr. Allen and Humbolt claimed the bad debt deductions. All of these facts are amplified by the important fact that all of the companies—lenders and borrowers—are related entities created by Mr. Allen. Taking all of that into account leads us to the conclusion that the true intention was to create equity positions in the recipient companies. This factor therefore weighs in favor of equity.

### H.    *Thin or Adequate Capitalization*

An advance made to a purported debtor who has thin capitalization is "very strong evidence of a capital contribution." *Estate of Mixon*, 464 F.2d at 408; *see also Povolny Grp., Inc. v. Commissioner*, T.C. Memo. 2018-37, at *17 ("[L]ack of capitalization weighs heavily in favor of finding that the payments at issue were capital contributions and not *bona fide* debt."). For this factor we examine whether the purported debtor's initial debt-to-equity ratio was high and whether the purported debtor realized it might increase. *Estate of Mixon*, 464 F.2d at 408. We also consider whether substantial portions of the advances were used to purchase capital assets or cover expenses needed to commence operations. *Id.*

To determine whether a purported debtor was thinly capitalized, we may consider the fair market value of its liabilities and assets, which may include its intangible assets. *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d 712, 723 (5th Cir. 1972), *aff'g* T.C. Memo. 1970-182; *Nye v. Commissioner*, 50 T.C. 203, 215 (1968). Courts frequently consider the purported debtor's assets and liabilities to ascertain a debt-to-equity ratio though "there is no magic debt-equity ratio which is appropriate for all corporations in all circumstances." *Wood Preserving Corp. of Balt. v. United States*, 347 F.2d 117, 120 (4th Cir. 1965). That said, the Fourth Circuit has previously suggested that a debt-to-equity ratio in excess of 5 to 1 is considered to be "high" and may result in finding inadequate capitalization. *Id.* at 120 & n.5.

Respondent argues that 12 of the 15 purported debtors' debt-to-equity ratios exceeded the 5 to 1 benchmark and 6 of them had a "negative equity" position when they received the funds. Respondent also cites Mr. Allen's testimony where he indicates that this result was obtained intentionally. He testified that his goal was to limit liability, and he did that by creating many different legal entities which held few assets that judgment creditors could go after.

**[\*24]** Petitioners argue that the purported debtors were well capitalized. They say that respondent's debt-to-equity ratios are inaccurate because they do not take into account the companys' significant intangible assets and their expectation of near-term growth in the real estate industry.

Petitioners' argument relies significantly on intangible assets such as (1) Mr. Allen's "sterling business reputation"; (2) "exclusive sales and administrative contracts for resort residential developments"; (3) a "well-trained workforce"; (4) a client database worth at least $100 million; (5) development plans; and (6) the ability to quickly "pre-sell . . . high-value development real estate . . . that [was] expected to generate sufficient cashflow." They cite *Murphy Logging Co. v. United States*, 378 F.2d 222, 224 (9th Cir. 1967), to support their argument that such intangible assets should be included in a debt-to-equity analysis.

In *Murphy Logging Co.*, 378 F.2d at 223, the taxpayer corporation borrowed $240,000 to purchase shareholder assets; the United States argued to recast the transaction as an equity infusion. The U.S. Court of Appeals for the Ninth Circuit held that the taxpayer was sufficiently capitalized despite having only $1,500 in cash because it owned valuable intangible assets such as future timber contracts and had reputable shareholders. *Id.* at 223–24. While informative, this holding is unpersuasive and should not be used to determine adequate capitalization since it was rejected by the Fifth Circuit in *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d at 723. Because *Plantation Patterns* was decided before formation of the "new Fifth," i.e., the Eleventh Circuit, it is controlling in these cases. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (holding that decisions of the Fifth Circuit before September 30, 1981, are binding precedent in the Eleventh Circuit).

In *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d at 723, the Fifth Circuit stated that the financial skills of the taxpayer should not be considered in valuing the debtor's intangible assets for purposes of computing its debt-equity ratio. It stated that "intangible assets such as those claimed for [the taxpayer] have no place in assessing debt-equity ratio unless it can be shown by convincing evidence that the intangible asset has a direct and primary relationship to the well-being of the corporation." *Id.* It said further that "it seems clear . . . that the assets sought to be valued must be something more than management skills and normal business contacts," which "are expected of management in the direction of any corporation." *Id.*

[*25] We believe that Mr. Allen's "sterling business reputation" and ability to quickly presell development projects—similar to the skills discussed in *Plantation Patterns*—should not be taken into account as they would be expected of management in any corporation. And while the sales contracts, client database, and development plans would have a "direct and primary relationship to the well-being" of the purported debtors, we agree with respondent that no evidence of such "off-balance-sheet assets" has been provided and therefore cannot be included in any debt-to-equity analysis. For that reason we find that the purported debtors were thinly capitalized when they received the advances.

Finally, as discussed more fully below, a larger portion of these advances went to the purchase of capital assets than they did to *commence* operations. *See Estate of Mixon*, 464 F.2d at 408. Taking all of this together, we find that this factor favors equity.

I.       *Identity of Interest Between Creditor and Stockholder*

An advance made by a creditor who is also a stockholder is examined with closer scrutiny. *Tribune Media Co.*, T.C. Memo. 2021-122, at *78. An inference of equity rather than debt arises when the amount advanced by the stockholder aligns pro rata with his ownership interest. *Stinnett's Pontiac Service, Inc. v. Commissioner*, 730 F.2d at 639; *Estate of Mixon*, 464 F.2d at 409; *Tribune Media Co.*, T.C. Memo. 2021-122, at *78. In contrast, "[a] sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is, however, strongly indicative that the debt is bona fide." *Estate of Mixon*, 464 F.2d at 409.

Petitioners argue that there is no identity of interests because neither WDS nor Humbolt ever held an ownership interest in any of the purported debtors. Respondent agrees but says that Mr. Allen or a member of his family owned 14 of the 15 recipient companies by way of the Allen Family Investment Trust and the GST Trust. Respondent thus argues that there was a constructive identity of interests sufficient to make this factor weigh in favor of equity.

The issues here are closely aligned to those discussed in *Tribune Media Co.*, T.C. Memo. 2021-122. There the same family controlled both the borrowing and issuing entities, and the Commissioner argued that the transaction should be recast as an equity investment, asserting "that where identity of interest exists, the creditors will not enforce payment." *Id.* at *79. We agreed with the Commissioner and stated that because

**[\*26]** the interests between the borrower and lender were "significantly intertwined," the factor favored equity. *Id.* at \*80.

In accordance with *Tribune Media Co.* we should "look to the intertwined interests of the lender and borrower case-by-case." *Id.* Here, the GST Trust and the Allen Family Investment Trust were set up for the benefit of Mr. Allen, his spouse, and their children. Together these trusts wholly owned the lenders in these cases: Humbolt, WDS, and WDS I. The GST Trust also wholly owned most of the entities that received advances. Therefore, Mr. Allen and his family were on both sides of the purported lending transactions as beneficiaries, albeit indirectly. Consequently, we believe the interests between the purported borrowers and lenders were "significantly intertwined." This factor therefore favors equity.

J.    *Source of Interest Payments*

"[A] true lender is concerned with interest," and an advance made with an interest rate suggests an intent to create a bona fide debt. *Estate of Mixon*, 464 F.2d at 409 (quoting *Curry v. United States*, 396 F.2d 630, 634 (5th Cir. 1968)). Generally, unless the purported debtor provides a reasonable explanation for the lack of interest payments, the absence of interest payments indicates that the purported creditor is not expecting substantial interest income and, instead, is more interested in future earnings, a characteristic of equity. *See Am. Underwriters*, T.C. Memo. 1996-548, slip op. at 26 (citing *Am. Offshore, Inc. v. Commissioner*, 97 T.C. 579, 604 (1991)).

The parties agree that no interest payments were made by any of the purported debtors. Petitioners assert that this factor nonetheless supports a bona fide debt finding because (1) each advance was issued with accruing interest due at maturity, (2) Mr. Allen expected the interest to be paid, and (3) he had a reasonable business explanation for the lack of enforcement: It allowed for "vital cashflow flexibility."

We are not convinced by petitioners' explanation despite Mr. Allen's significant real estate experience. As courts before us have said, a true lender is concerned with interest income. *See Curry*, 396 F.2d at 634. Although the advances may have intentionally been structured with the objective of allowing the purported debtors increased cashflow, it is not apparent that they were "seriously expecting any substantial interest income" since none was ever collected. *See Estate of Mixon*, 464 F.2d at 409. Instead, it appears that the future earnings of the

**[\*27]** purported debtors were of utmost importance. This factor therefore weighs in favor of equity.

K.   *Ability of the Corporation to Obtain Loans from Outside Lending Institutions*

Debt characterization is supported when the advance at issue could have been obtained with substantially similar terms from an unrelated outside lending institution. *Id.* at 410; *VHC, Inc.*, T.C. Memo. 2017-220, at \*65 ("[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms." (quoting *Segel*, 89 T.C. at 828)).

Petitioners argue that the purported debtors could have obtained similar terms from private lenders when the loans were made because they had significant assets and projected revenue. Petitioners conceded that an unaffiliated lender might have required a personal guaranty but argue that, as in *Litton Business Systems*, such a difference does not make the purported loans a patent distortion from what was available. *See Litton Bus. Sys., Inc. v. Commissioner*, 61 T.C. 367, 379 (1973) (noting that this is not a "mechanical test of absolute identity between the advance account and what debt actually or hypothetically would have been available").

Respondent disagrees. He argues that the terms of the purported loans were not commercially acceptable and that unrelated lenders would not issue loans with similar terms without personal guaranties, collateral, or higher interest rates. Respondent also asserts that the economic reality of the purported debtors' financial status—i.e., their being undercapitalized and insolvent—would inhibit an outside lender from issuing similarly termed advances to the purported debtors. Respondent argues that this would be especially true for any lender in the position of Mr. Allen, who had full access to these purported debtors' financials at the time of the advances.

Respondent illustrates the weakness of petitioners' argument by providing examples which show that a commercial loan from an unrelated lender was not viable. Waterfront Marketing was formed in 2005 with a $1,000 capital contribution and during that year reported a $1,013 loss. In the following spring, WDS provided Waterfront Marketing with a $9,200,000 line of credit at a 4.4% interest rate. This credit line was unsecured, had no guaranty, and required no payment for nine years. We find it very difficult to believe an unaffiliated lender

[*28] would advance that much money on similar terms. This would therefore constitute a "patent distortion" from what was available in the market. *See id.* at 379.

Although Waterfront Marketing's situation is but one example, petitioners' expert witness conceded that most of the purported debtors had credit ratings of below CCC. This means that they were possible credit risks when the advances were made. Since Humbolt, WDS, and WDS I had full access to the purported debtors' financials at that time, they must have disregarded these risks, indicating that the advances were not true debts. *See VHC, Inc.*, T.C. Memo. 2017-220, at *63 (holding that advances were not debt when the taxpayer disregarded "clear signs" that the purported debtor and his related companies were financially unstable); *see also Shaw*, T.C. Memo. 2013-170, at *12–13 (holding that "a third-party lender with perfect knowledge of the company's finances . . . would not have been so generous" and "no outside lender, animated by a genuine desire for repayment, would have behaved as did [the taxpayer]" and so the advances did not constitute "a bona fide debt that arose from a debtor-creditor relationship"). We therefore agree with respondent that this factor favors equity.

L.     *Extent to Which the Advance Was Used to Acquire Capital Assets*

An advance of funds used to meet the cost of daily operational needs, rather than to purchase capital assets, is indicative of bona fide indebtedness. *Roth Steel Tube Co. v. Commissioner*, 800 F.2d at 632; *Estate of Mixon*, 464 F.2d at 410. Conversely, "[u]se of an advance by an ongoing business to expand its operations, e.g., by acquiring an existing business," suggests an equitable contribution. *Laidlaw Transp., Inc.*, T.C. Memo. 1998-232, slip op. at 79 (first citing *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d at 713–16, 722; and then citing *Tyler*, 414 F.2d at 846, 848–49).

The parties have stipulated that WDS contracted with the marketing companies to provide sales and marketing services for the 2009 development projects and with Waterfront Communities to provide administrative services for the 2009 development projects in the Southeast and Texas. Each of the marketing companies agreed to develop marketing and sales strategies that would be used to promote and facilitate the lot sales for the 2009 development projects.

**[\*29]** Each of these entities received advances from WDS, WDS I, or Humbolt during the years in issue, some of which were used to meet the costs of daily operations. At trial, Mr. Allen described the "hot" residential real estate market as requiring the marketing companies to "[promote] heavily and [spend] heavily."

While we agree with petitioners that some of the advances were used to meet the costs of daily operations, we acknowledge that others were used to purchase capital assets, such as real property. For example, the parties have stipulated that RRDG, Marathon, ML&G Investments, the 9-30-02 trust, and the 6-08-05 trust were "investment entities" whose primary purpose was to invest in the real estate market. In addition in 2006 Southeastern Waterfront was advanced $1,648,000 and reported on its December 31, 2005 and 2006 balance sheets that it purchased capital assets such as boats and sales trailers. Thus, it appears that while some of the advances were used to meet the daily operating needs of the marketing companies and Waterfront Communities, other advances were used to purchase capital assets; therefore, this factor is neutral at best.

M. *Failure of the Debtor to Repay on the Due Date or Seek a Postponement*

Both the Fourth and the Eleventh Circuits have held that failure of the debtor to repay on the due date or seek a postponement is arguably the most significant factor in the debt-equity analysis. *Mills*, 840 F.2d at 233; *Lane*, 742 F.2d at 1317.

Here, each of the purported loans at issue included a due date at least four years after 2009, and the purported debtors were not obligated to make repayments before the date of maturity included in each of the purported loans. Since Mr. Allen and Humbolt have already written the debts off as worthless, the purported debtors technically did not fail to repay the advances by the due date. For that reason, petitioners argue that this factor weighs in favor of debt.

In a similar situation—where no due date existed at all—the Eleventh Circuit has found that a "strong inference" arises that the lender never intended to compel repayment if no payments were made or ever demanded. *Stinnett's Pontiac Serv., Inc. v. Commissioner*, 730 F.2d at 640; *see also Shedd v. Commissioner*, T.C. Memo. 2000-292, slip op. at 6. In this Court we have held that "it is premature to rely on this factor as tending to demonstrate either the equity or the debtlike

**[\*30]** features of the advance agreements" where the debts have not yet matured. *PepsiCo P.R., Inc.*, T.C. Memo. 2012-269, at \*97.

As indicated previously in this Opinion, we conclude that the parties intended these advances to constitute equity although they were papered as debt. We agree with the Eleventh Circuit that the failure to demand or make payments leads to a strong inference that there was never truly an intention to collect the debts. This factor however questions whether the purported debtors failed to make payments by the due date. In these cases those dates never arose before the debts were written off as uncollectible. Accordingly, we find that this factor is neutral.

IV.    *Outcome of the Mixon Factors*

Of the 13 factors listed in *Estate of Mixon*, 7 favor equity, 3 favor debt, and 3 are neutral. After weighing them in the context of these cases, we conclude that the advances do not constitute debt and were therefore not deductible under section 166. That finding precludes the need for any analysis on whether the amounts were wholly or partially worthless.

V.    *Section 6662 Accurary-Related Penalities*

The notice of deficiency to Mr. Allen sets forth various grounds for the imposition of section 6662 accuracy-related penalties. Only one accuracy-related penalty for a given year may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one ground. *See* Treas. Reg. § 1.6662-2(c). We will only address whether Mr. Allen is liable for accuracy-related penalties on the ground that the underpayments of tax for 2005 and 2006 were substantial under section 6662(b)(2).

According to our caselaw, "the Commissioner bears the burden of production with respect to the liability of an individual for any penalty." *Graev v. Commissioner*, 149 T.C. 485, 493 (2017) (citing § 7491(c)), *supplementing and overruling in part* 147 T.C. 460 (2016). The Commissioner satisfies that burden by presenting sufficient evidence to show that it is appropriate to impose the penalty in the absence of available defenses. *Id.* (citing *Higbee*, 116 T.C. at 446). This includes satisfying section 6751(b), which provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate

**[\*31]** supervisor of the individual making such determination or such higher level official as the Secretary may designate."

In *Kroner v. Commissioner*, 48 F.4th 1272 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73, the Eleventh Circuit disagreed with this Court regarding the timing of the section 6751(b) approval requirement. The Eleventh Circuit held that "the IRS satisfies [s]ection 6751(b) so long as a supervisor approves an initial determination of a penalty assessment before it assesses those penalties." *Id.* at 1276.

We follow the relevant precedent of the Court of Appeals to which an appeal would generally lie. *See Golsen*, 54 T.C. at 757. An appeal by Mr. Allen would lie in the Eleventh Circuit, and therefore *Kroner* is controlling. Since the civil penalty forms were approved for Mr. Allen before the notice of deficiency was issued to him, the IRS complied with section 6751(b).

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty for an underpayment of tax due to a substantial understatement of income tax. For purposes of that section, an understatement of tax generally means the excess of tax required to be reported on the return over the amount shown on the return. § 6662(d)(2)(A). An understatement of income tax is substantial in the case of an individual if it exceeds the greater of 10% of the tax required to be shown on the return for that taxable year or $5,000. § 6662(d)(1)(A). Mr. Allen's income tax was understated by $2,646,969 and $2,054,073 for 2005 and 2006, respectively. Therefore, the understatements were substantial.

The accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows that he had reasonable cause and acted in good faith. § 6664(c)(1); *see Higbee*, 116 T.C. at 446–47. The determination of whether the taxpayer had reasonable cause and acted in good faith depends upon the pertinent facts and circumstances of a particular case. Treas. Reg. § 1.6664-4(b)(1). We consider, among other factors, the experience, education, and sophistication of the taxpayer; however, the principal consideration is the extent of the taxpayer's efforts to assess the proper tax liability. *Id.*; *see also Higbee*, 116 T.C. at 448. In so assessing, reliance on professional advice may indicate reasonable cause and good faith "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. § 1.6664-4(b)(1).

**[\*32]** Mr. Allen argues that he had a reasonable basis for claiming the bad debt deductions. We disagree. At trial he testified that he did not seek professional advice when he determined the purported loans were worthless. He also said that while he employed legal counsel, he did not consult with them specifically about the tax consequences of assigning the purported loans because these decisions were "business decisions between businesspeople." There is no evidence that Mr. Allen took any steps to assess the proper tax liability. We therefore conclude that Mr. Allen is liable for the substantial underpayment penalties.

## VI.    *Conclusion*

We conclude the advances made to the purported debtors were not debt and therefore were not deductible by Mr. Allen and Humbolt as section 166 bad debt expenses. Because Mr. Allen has not demonstrated reasonable cause for claiming the deductions, we sustain the section 6662 penalties.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*